**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BLYTHE HOLDINGS, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.:  06-C-5262 |
| | ) | |
| FLAWLESS FINANCIAL CORPORATION, | ) | Judge Robert M. Dow, Jr. |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on several motions to dismiss Plaintiffs' first amended complaint, filed by the various Defendants.  On May 9, 2008, Defendants Phillip Kupritz, K2 Architects, Inc. and Cion Companies Inc. moved to dismiss or stay proceedings and compel arbitration [164].  On June 9, 2008, Defendant Shirley Coleman moved to dismiss [177].  On June 9, 2008, Defendant John DeAngelis moved to dismiss [182].  And on June 30, 2008, the Brown and Udell Defendants moved to dismiss [188].

For the following reasons, the Court grants in part and denies in part the K2 Defendants' motion to dismiss or stay proceedings and compel arbitration [165], denying the motion as to the request to dismiss but granting the motion to compel arbitration and staying proceedings as to the K2 Defendants.  The Court grants in part and denies in part Defendant John DeAngelis' motion to dismiss [182], and the Court also grants in part and denies in part the Brown Udell Defendants' motion to dismiss [188].  In particular, as to the lawyer Defendants, the Court denies the motions on Plaintiffs' unjust enrichment claims and grants the motions on Plaintiffs' legal malpractice and equitable accounting claims.  The Court denies Defendant Shirley Coleman's motion to dismiss [177].

## I.    Factual Background[1]

In their first amended complaint, Plaintiffs allege that they were victims of a "real estate based scheme to defraud investors" in connection with the redevelopment of vacant lots in the City of Chicago's 16th Ward.  The scheme was allegedly devised by Defendant Tracy Williams and implemented through companies controlled by her.[2]  The first amended complaint alleges that former 16th Ward Alderman Shirley Coleman was a willing and active participant in the fraudulent scheme and that she "controlled" a City community redevelopment program involving the sale of vacant lots in the 16th Ward.  According to the allegations, the City of Chicago maintains a redevelopment program called Negotiated Sale of Redevelopment Project Area Properties, under which it sells developers vacant land owned by the city for the purpose of development and offers them assistance in planning, acquisition, zoning, permitting, construction, and resale.  These programs are administered by the Department of Planning and Development, but are subject to the approval and control of the City of Chicago, the Chicago City Council, and aldermen in the wards in which the properties are located.

However, before Plaintiffs set forth the allegations involving the City's redevelopment project, Plaintiffs allege that from 2003 to 2005 Defendants engaged in a scheme to harm not only Plaintiffs but other entities not named as parties to this action.  The first allegations concern a private business deal that occurred in 2003 between Defendant Williams and an individual

---

[1]  The following facts are taken from Plaintiff's first amended complaint.  For present purposes, the Court accepts the allegations in the complaint as true, as precedent instructs.  See, *e.g.*, *Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596, 597 (7th Cir. 2004).  At this juncture, the Court takes no position on whether any of the allegations are, in fact, well-founded.

[2]  "Flawless" is defined in the prefatory paragraph of the Complaint to include collectively "Flawless Financial Corporation, an Illinois corporation, Flawless Financial Mortgage Corporation, an Illinois corporation, Tracy Williams, Tracy Williams d/b/a Flawless Financial, Tracy Williams d/b/a Flawless Financial Corporation, Tracy Williams d/b/a Flawless Financial Mortgage Corporation (individually and collectively 'Flawless' hereafter)."

named Ali Khounsary. Plaintiffs' allegations concerning the "Khounsary Scheme" include that in late 2003, the Flawless Defendants failed to perform their end of a contract to rehabilitate certain investment property owned by Khounsary and that Khounsary lost money on the deal. Plaintiffs further allege that the Flawless Defendants "converted and diverted Khounsary's money and a substantial amount of his credit to [Williams's] own personal use instead of applying it to the project Khounsary had hired [Williams] for."

Plaintiffs next allege that the Flawless Defendants, as well as others not named as defendants in the instant complaint, committed financial institution fraud against Park Federal Savings Bank in September 2003. Plaintiffs allege that the Flawless Defendants, Florin Burlan, and Mozell Barnes made misrepresentations to Park Federal in connection with the sale of real estate in an effort to defraud Park Federal Savings Bank out of mortgage proceeds. According to the complaint, Park Federal Savings Bank, relying upon false representations made by Williams, Burlan, and Barnes, extended a mortgage loan in excess of the value of property at 932-944 79th Street in Chicago, Illinois. Plaintiffs further claim that Williams, Burlan, and Barnes misrepresented the financial terms "for personal gain and profit." Then, in early 2004, Plaintiffs claim that Williams, Burlan, and Lavoran Blakely once again defrauded Park Federal in connection with a loan on real estate located at 4800-4810 S. Calumet Avenue in Chicago. Plaintiffs allege that the earnest money amount was falsely represented to the financial institution, making it appear that the loan amount sought was a percentage of the sales price.

Plaintiffs next claim that Williams, Flawless, and Burlan engaged in a scheme to defraud a private company, Venture Equities, which made a short term loan to Burlan. Plaintiffs allege that an escrow, with the Flawless Defendants as escrowee, was set up at the closing on certain unidentified property. The purpose of the escrow was to use the funds to make the first three

months interest payments on the loan. Plaintiffs claim that the Flawless Defendants converted the escrow funds to their own use and passed them on to Burlan, who then defaulted on the loan.

Then, in 2005, Plaintiffs allege that the Flawless Defendants turned their attention to them. According to the complaint, Defendant Williams advised Stephanie Hill, President of Blythe Holdings, that Coleman had 400 city lots available, all in contiguous parcels,[3] in the 16th Ward of Chicago. Plaintiffs allege that Williams advised Hill that Flawless was a licensed mortgage company and that it would provide attractive construction financing as well as mortgages for the ultimate purchases of the new construction. Williams also informed Hill that she had 1,200 pre-qualified and approved clients ready to buy developed property. The complaint further alleges that Coleman told Hill that Blythe would have to enter into an agreement with Flawless to accomplish the project. Williams advised Hill that Flawless would act as a co-developer and consultant, which would permit Coleman to "walk all of the paperwork through" city hall, obtain the necessary permits, and start construction (weather permitting) no later than March 2006. According to the complaint, in October 2005, Hill met with Williams, Coleman, and Willie Miles (an "associate" of Flawless, Williams, and Coleman) at a condominium owned by Williams.

In an agreement dated October 25, 2005, Flawless Financial and Tracy Williams "agreed to deliver up to 400 residential building lots to Blythe Holdings, Inc. or assigns for $1 million or $2,500 per lot in a minimum 6-9 month time frame period." [DE 160, Ex. B]. The agreement required Blythe to enter into a minimum of a six month consulting agreement with Flawless for $20,000 per month. The agreement also provided that Blythe would pay a $50,000 retainer to Flawless Financial upon execution by both parties of the consulting agreement and that Blythe

---

[3] According to the complaint, contiguous parcels in blocks of at least two or three lots were essential for efficient and cost-effective development.

would pay a "bonus payment" of $400,000 ($1,000 per lot) to Flawless as each lot was secured

to Blythe or its assigns.  The terms also stated that Blythe was to use the architectural firm of

Phil Kittredge [sic], recommended by Flawless, and to pay the architect a retainer of $25,000

upon execution of the consulting agreement.  Finally, the agreement also required Blythe to use

an attorney recommended by Flawless Financial and to pay the attorney a $25,000 retainer upon

execution of the consulting agreement.  The total deposit of $100,000 (including the retainers for

the architect and the attorney as well as the $50,000 retainer for Flawless) was to be wired to

Flawless upon execution of the agreement.  Both Tracy Williams and Stephanie Hill signed the

agreement on October 26, 2005.  *Id*.  Accompanying the consulting agreement was a letter from

Tracy Williams to Stephanie Hill, describing the agreement and setting forth additional details.

On November 7, 2005, Blythe hand delivered a $50,000 cashier's check to Flawless to

satisfy the agreed upon retainer.  On November 16, 2005, $150,000 was wired from Blythe's

U.S. Bank account to Flawless for use in the acquisition of the 400 lots.  According to the

complaint, Williams paid Coleman a share of the money wired by Blythe by directing Nancy

Villacorta (an "associate" of Flawless and Williams) to send $50,000 to Coleman's church.

On November 28, 2005, John DeAngelis, an attorney with Brown, Udell & Pomerantz,

Ltd., sent Hill a letter (on Brown Udell letterhead) regarding "Acquisition of Vacant Lots –

Chicago, Illinois."  The purpose of the letter was "to provide Blythe Holdings, Inc. ("you") and

our firm with a written memorandum of the terms and conditions under which we will undertake

to represent you."  [DE 160, Ex. D].  The letter set forth, "[a]s we have discussed, we will

provide (both directly and through sub-consultants retained by us) such services in connection

with the preparation, assembly, review and completion of an Application for Purchase of

Property to the City of Chicago Department of Planning and Development * * *."  The letter

stated that services would be rendered at a flat fee of $50,000. The letter was signed by John A. DeAngelis under the firm name of Brown, Udell & Pomerantz, Ltd.

Plaintiffs allege that DeAngelis and Brown and Udell represented Williams and Flawless in prior dealings. According to the complaint, neither DeAngelis nor anyone else at Brown and Udell told Hill or anyone at Blythe that they had represented Williams and Flawless in the past. According to Plaintiffs, if they had known that DeAngelis and Brown and Udell had a pre-existing attorney-client relationship with Williams and Flawless, they would not have hired them. On December 1, 2005, Blythe paid DeAngelis the $25,000 retainer required by the agreement between Hill and Williams. According to the complaint, DeAngelis sent Williams and Flawless a copy of Blythe's retainer agreement.

Blythe Holdings also "intended" to enter into a standard form architect agreement with "K2."[4] [DE 160, Ex. E]. The agreement was signed by Phillip Kupritz, as a registered Illinois architect and Principal for K2. Plaintiffs contend that this agreement is not enforceable because K2 is a "legal nothing." Plaintiffs further allege that neither K2 nor Cion Companies were registered or licensed to practice architecture or deliver architecture services in Illinois at the time the writing was signed by Kupritz.[5] Despite Plaintiffs' contention that they did not enter into a written agreement with Kupritz, on December 1, 2005, Blythe paid Kupritz $25,000 as a retainer for the work he was to do in connection with the agreement between Blythe and Williams. Additionally, the agreement contained mediation and arbitration provisions, requiring the parties to first engage in mediation and then arbitration prior to the institution of legal proceedings.

---

[4] The copy of the purported agreement, which is attached to the complaint, is not dated.

[5] According to the complaint, the license of K2 Architects Inc. expired in April 2005, and Cion Companies did not become licensed until sometime in 2006.

In a letter dated November 21, 2005, Coleman thanked Blythe for its interest in the 16th Ward and wrote that Flawless was "an excellent consultant and well proficient in all areas associated with project development." She further wrote that attorney John DeAngelis and architect Phil Kupritz were held "in high regard with the City of Chicago." In a letter to Blythe dated December 12, 2005, Coleman confirmed and approved the agreement between Flawless and Blythe and enclosed a list of 100 lots that had been "reserved" in the first phase of the plan. Plaintiffs contend that these 100 lots had already been reserved for a developer named "Hobbs" and that, unbeknownst to Plaintiffs, Hobbs also was working with Coleman, DeAngelis, and Kupritz.

On December 8, 2005, Blythe wired $15,000 to Flawless. On December 20, Blythe wired $250,000 in two separate transfers (one for $100,000 and one for $150,000) to the client trust account of DeAngelis and Brown and Udell. According to the complaint, the funds were to be held by DeAngelis and Brown and Udell until the City of Chicago delivered deeds or other suitable documents of title for the property to the 100 lots. On December 21, DeAngelis and Brown and Udell wired the money to Flawless, but instead of using the money to pay for the acquisition of the lots, Plaintiffs allege that Williams began spending the money on personal items and matters unrelated to Blythe's transaction.

In January 2006, Hill and one of Blythe's investors traveled to Chicago to view the remaining 300 lots that were offered for development. According to Plaintiffs, the 300 lots shown to Hill and the investor were unsuitable for development and were not the lots that had been promised to Blythe by Coleman and Flawless the previous fall. On February 17, 2006, Flawless sent a letter of termination to Blythe, citing Plaintiffs' inability to secure funding for the

remaining 300 lots. Flawless confirmed its outstanding obligation with respect to the first phase of 100 lots.

From this point on, the allegations are particularly difficult to follow. In February 2006, John Jones, Plaintiffs' financial consultant and a principal in Blythe, sent a letter to DeAngelis, demanding performance from all parties upon threat of litigation. DeAngelis responded with a letter reassuring Blythe that all fees associated with the acquisition had been paid. However, Plaintiffs contend that there were no fees that needed to be paid. In late February 2006, DeAngelis and Williams advised Blythe to form a new Illinois corporation, Chicago 100, Inc. According to the complaint, DeAngelis and Williams claimed that this was necessary to complete the acquisition of the lots and move the project forward. DeAngelis incorporated Chicago 100, Inc. on March 15, 2006. According to Plaintiffs, it was only after the "threat of litigation" that DeAngelis applied for lots on behalf of Chicago 100, Inc.[6] Plaintiffs also allege that DeAngelis assured them that Chicago 100, Inc. succeeded in interest to the rights of Blythe in connection with the lot acquisition application. Plaintiffs contend that none of the Defendants ever applied for any lots on behalf of Blythe.

The complaint alleges that on February 23, 2006, Kupritz sold to Hobbs the original drawings that Blythe paid Kupritz to render. Plaintiffs contend that Hobbs submitted these plans with his application to the City of Chicago's Department of Planning and Development. On March 28, 2006, DeAngelis and Kupritz met with Michelle Nolan, the Community Development Division–South Region Project Manager for the City of Chicago's Department of Planning and Development, on behalf of Hobbs. However, during that meeting they presented a proposal on behalf of Chicago 100 to acquire and develop 100 lots. On April 19, 2006, Kupritz faxed

---

[6] According to Plaintiffs, these were the same lots that Coleman had approved for Hobbs.

Plaintiffs a revised timetable for the application process, indicating that the lots would not be ready until August and that the $40,000 tax incentive originally promised to the developer would be provided to the homeowners.

On May 4, 2006, Hill wrote to Coleman to confirm that payment for the lots had been received and that the lots were to be deeded upon completion of the application, which was to be submitted by DeAngelis on or before May 15, 2006. On May 5, 2006, Kupritz provided Plaintiffs with a second parcel map of 100 lots. Plaintiffs allege that lots reserved for Hobbs had been removed from the list of available lots and that the lots on this second map were unsuitable. On May 18, Plaintiffs again wrote to Coleman, explaining in detail the difficulties in working with Flawless and requesting a meeting to resolve outstanding issues. Coleman did not respond to either letter.

On May 23, 2006, Michelle Nolan met with Jacquanette Johnson, an independent "project manager" retained by Plaintiffs, and provided her with a new list of possible lots. According to Plaintiffs, Nolan informed them that none of the 400 lots promised to them had been reserved or paid for. She also informed them of the "real steps" to apply for property through the program.

Plaintiffs claim that they have suffered millions of dollars in damages. Plaintiffs have paid $465,000 to Flawless and $25,000 each to DeAngelis/Brown and Udell and Kupritz, for a total of $515,000 to Defendants. Plaintiffs also claim to have lost millions of dollars in unrealized profits, opportunity costs, and legal expenses.

On April 25, 2008, Plaintiffs filed their first amended complaint, alleging the following causes of action: violation of 18 U.S.C. § 1962(c) against the Flawless Defendants (Count I); violation of 18 U.S.C. § 1962(d) against the Flawless Defendants and Shirley Coleman (Count

II); common law fraud against the Flawless Defendants and Coleman (Count III); legal malpractice against John DeAngelis and Brown and Udell (Count IV); legal malpractice against Brown and Udell (Count V); breach of fiduciary duty against the Flawless Defendants and Coleman (Count VI); unjust enrichment against all Defendants (Count VII); constructive trust against the Flawless Defendants and Coleman (Count VIII); equitable accounting against all Defendants (Count IX); and civil conspiracy against the Flawless Defendants and Coleman (Count X). With the exception of the Flawless Defendants, who have not answered or otherwise responded to the first amended complaint, all other Defendants have moved to dismiss all claims against them.

## II.    Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the suit. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1969 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic*, 127 S.Ct. at 1965, 1973 n.14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic*, 127 S.Ct. at 1969. The Court accepts as true all of the well-pleaded facts alleged by the

plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

Rule 9(b) of the Federal Rules of Civil Procedure creates exceptions to the federal regime of notice pleading and specifies that, for "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); see also *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir. 2007). "Read together, Rule 9(b) and Rule 8 require that the complaint include the time, place and contents of the alleged fraud, but the complainant need not plead evidence." *Amakua Development LLC v. Warner*, 411 F. Supp. 2d 941, 947 (N.D. Ill. 2006) (citing *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*, 1993 WL 360426, at *3 (N.D. Ill. Sept. 15, 1993)). In other words, the complaint must allege the "the who, what, when, where, and how: the first paragraph of a newspaper story." *Borsellino,* 477 F.3d at 507 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990)). Plaintiffs' fraud claims, including Plaintiffs' RICO claims, will be viewed under this heightened pleading standard.

## III. Analysis

Plaintiffs have alleged a civil RICO action against the Flawless Defendants and a RICO conspiracy action against the Flawless Defendants and Shirley Coleman. The remaining claims are all state law claims. As an initial matter, the Court notes that several of the Defendants have argued that the Court should decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiffs' state law claims against them. Section 1367 provides that when a district court has original jurisdiction over an action, the court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States

Constitution," even if those claims "involve the joinder or intervention of additional parties." 28

U.S.C. § 1367(a). Two claims are part of the same case or controversy if they "'derive from a

common nucleus of operative facts. A loose factual connection between the claims is generally

sufficient.'" *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1299 (7th Cir.1995) (quoting

*Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir.1995)); see also *Sanchez & Daniels v. Koresko*,

503 F.3d 610, 614 (7th Cir. 2007). In the present case, the state law claims clearly form part of

the same case or controversy as Plaintiffs' RICO claims; thus, as long as Plaintiffs' RICO claims

remain pending, the Court retains supplemental jurisdiction over the state law claims.

### A.     The K2 Defendants' Motion to Dismiss or Stay Pending Arbitration

In their first amended complaint, Plaintiffs assert causes of action against the K2

Defendants for unjust enrichment and an equitable accounting, based on allegations that

Plaintiffs paid the K2 Defendants a $25,000 retainer for architectural services that the K2

Defendants failed to perform. The K2 Defendants argue that two written contracts govern

Plaintiffs' relationship with them, specifically, two Standard Forms of Agreement Between

Owner and Architect ("the architect agreements"). According to the K2 Defendants and not

contested by Plaintiffs, the parties entered into the first contract on November 29, 2005, and the

second contract on March 8, 2006. Both architect agreements contain the following mediation

and arbitration provisions:

**1.3.4 MEDIATION**

1.3.4.1 Any claim, dispute or other matter in question arising out of or related to
this Agreement shall be subject to mediation as a condition precedent to
arbitration or the institution of legal or equitable proceedings by either party.

**1.3.5 ARBITRATION**

> 1.3.5.1  Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration.  Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Paragraph 1.3.4.
>
> 1.3.5.2  Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect.
>
> 1.3.5.4 * * * The foregoing agreement to arbitrate * * * shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

Plaintiffs did not attempt to resolve their dispute with the K2 Defendants by mediation or submit their claims to arbitration prior to filing this lawsuit.  Instead, Plaintiffs claim, in response to the motion to dismiss, that the architect agreements are void and unenforceable and therefore they did not need to submit to mediation or arbitration prior to filing suit.

The Federal Arbitration Act ("FAA") provides that an arbitration clause in a "contract evidencing a transaction involving commerce * * * shall be valid, irrevocable, and enforceable save upon such grounds as exist in law or equity for the revocation of any contract."  9 U.S.C. § 2.  In determining whether the parties have agreed to arbitrate, "courts generally * * * should apply ordinary state-law principles" governing contract formation.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  Once it is clear that the parties have a contract that provides for arbitration of some issues between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration.  See *Miller v. Flume*, 139 F.3d 1130, 1137 (7th Cir. 1998).

Plaintiffs first contend that the Court should not consider Exhibits A through D to the K2 Defendants' motion because they are "extrinsic to the pleadings," and Plaintiffs "do not seek to have [the K2 Defendants'] motion to dismiss converted to a motion for summary judgment." Federal Rule of Civil Procedure 12(d) provides that the court must treat a motion under Rule

12(b)(6) or 12(c) as one for summary judgment if matters outside the pleadings are presented to and not excluded by the court. The K2 Defendants argue that they have moved to dismiss or stay Plaintiffs' claims against them under Rule 12(b)(1) and 12(b)(3), and therefore Rule 12(d) does not apply. See *Hanson Eng'rs Inc. v. UNECO, Inc.*, 64 F. Supp. 2d 797, 799 (C.D. Ill. 1999); see also *Crawford v. U.S.*, 796 F.2d 924, 928 (7th Cir. 1986) ("The omission from the Federal Rules of Civil Procedure of a provision for converting a Rule 12(b)(1) motion into a summary judgment motion if evidence is submitted with it was not an oversight"). However, even if Rule 12(d) did apply, the K2 Defendants' exhibits would not require the Court to convert their motion into one for summary judgment. First, Exhibits A and D are public records, and the Court may consider them without converting the K2 Defendants' motion into one for summary judgment. See *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008). Second, Exhibits B and C (the architect agreements between Blythe Holdings and K2) are referred to in Plaintiffs' amended complaint and are central to their claims. Accordingly, the Court may consider these documents in deciding the motion to dismiss. See *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1992).

Plaintiffs do not appear to argue that their claims against the K2 Defendants do not "arise out of" or are not "related to" the architect agreements. Instead, Plaintiffs argue that at the time the architect agreements were executed, neither K2 nor Cion was registered as a professional design firm under the Architecture Practice Act. Alternatively, Plaintiffs contend that the second architect agreement is invalid because the first page of the agreement identifies the architect as "K2," rather than using K2's full corporate name, "K2 Architects, Inc.," and, at the time the agreement was signed, "K2" was not a registered legal entity or assumed business name. The K2 Defendants concede that neither K2 nor Cion was registered as a design firm at the time the

contracts were executed, but they argue that since the actual architect performing the services, Phil Kupritz, was a licensed architect at all relevant times, the contract is still enforceable.

The critical question therefore is whether a corporation engaged in the practice of architecture can enforce a contract for architectural services when it is not licensed as required by the Illinois Architecture Practice Act of 1989. Section 21 of the Act, entitled "Professional design firm registration," provides:

> (a) Nothing in this Act shall prohibit the formation, under the provisions of the Professional Service Corporation Act, of a corporation to offer the practice of architecture.
>
> Any business, including a Professional Service Corporation, that includes the practice of architecture within its stated purposes, practices architecture, or holds itself out as available to practice architecture shall register with the Department under this Section. Any professional service corporation, sole proprietorship, or professional design firm offering architectural services must have a resident architect overseeing the architectural practices in each location in which architectural services are provided.

225 ILCS 305/21. Plaintiffs rely on the Illinois Appellate Court's opinion in *Kaplan v. Tabb Associates, Inc.*, 657 N.E.2d 1065 (Ill. App. Ct. 1st Dist. 1995), to support their argument that K2 and Cion's failure to register as a professional design firm renders the architect agreements void. Indeed, the *Kaplan* court did hold that an architectural services contract entered into by an unregistered firm was void and unenforceable. However, *Kaplan* conflicts with other Illinois cases, and subsequent Illinois state and federal courts have refused to follow it. See *G.M. Fedorchak & Assocs., Inc. v. Chicago Title Land Trust Co.*, 822 N.E.2d 905, 909-10 (Ill. App. Ct. 3d Dist. 2005); *Brethren Home of Girard, Ill. v. OSM, Inc.*, 2007 WL 4917788 (C.D. Ill. Feb. 11, 2007); *Parkman & Weston Asso., Ltd. v. Ebenezer African Methodist Episcopal Church*, 2003 WL 22287358 (N.D. Ill. Sept. 30, 2003). Instead, these courts have followed *Hattis Associates, Inc. v. Metro Sports, Inc.*, 339 N.E.2d 270, 273 (Ill. App. Ct. 4th Dist. 1975), in

which the court held that an unlicensed architectural firm could legally contract to provide services by a licensed architect.

Kaplan noted that the Illinois Architecture Practice Act of 1989, 225 ILCS 305/1 et seq., made registration of architectural firms mandatory. The Act also provides criminal penalties for violations of architectural firm registration and individual architect licensing requirements. See 225 ILCS 305/36(a). The Kaplan court reasoned that the contract was void because allowing an architectural firm to provide architectural services without being registered was contrary to the public policy behind the Act. On the other hand, the Court in Hattis noted (i) that the purpose of the Act is not to protect architects, but rather to protect the public from the possible dangers of the work of "incompetent and unlicensed architects," and (ii) that "an unlicensed corporation may contract to provide services by licensed individuals." 339 N.E.2d at 273.

This Court "must apply the law of the state as it believes the highest court of the state would apply it if the issue were presently before that tribunal." State Farm Mut. Auto. Ins. Co. v. Pate, 275 F.3d 666, 669 (7th Cir. 2001). Plaintiffs contend that the Illinois Supreme Court validated Kaplan in Chatham Foot Specialists, P.C. v. Health Care Serv. Corp., 216 Ill. 2d 366 (2005), while the K2 Defendants argue that Chatham Foot Specialists actually supports their position. In Chatham Foot Specialists, the plaintiff was a professional service corporation providing podiatric services to its patients. The plaintiff contracted with Blue Cross, a health insurance provider, to deliver podiatric services as a participating provider under Blue Cross's insurance plans. Blue Cross, in turn, agreed to pay plaintiff fees for podiatric services provided by plaintiff to patients insured by Blue Cross. At the time plaintiff and Blue Cross executed the contract, Plaintiff did not possess a current certificate of registration from the Illinois Department of Professional Regulation. However, all of the podiatrists employed by the plaintiff were

properly licensed to practice podiatry.  Blue Cross cancelled the contract, and the plaintiff sued Blue Cross to recover unpaid bills for podiatric services the plaintiff rendered to patients insured by Blue Cross.  Blue Cross successfully moved for summary judgment on the grounds that the plaintiff's failure to obtain a certificate of registration from the Illinois Department of Professional Regulation rendered the agreement void and barred the plaintiff from enforcing it. The Appellate Court, relying in part on *Kaplan*, affirmed.

The Illinois Supreme Court reversed the Appellate Court, holding that the agreement was valid and enforceable, notwithstanding the plaintiff's failure to register with the Illinois Department of Professional Regulation, because the plaintiff's podiatrists were licensed.  The Supreme Court reasoned that, because the podiatrists who provided the services were licensed, the Podiatry Medical Practice Act's "goal of protecting the public was not implicated by the facts in the instant cause." *Id*. at 399.  The Court also held that "the term 'certificate of registration' as used in the [Professional Services Corporation Act] is not functionally equivalent to a license to practice a profession, and that there is nothing in the Act to indicate that the requirement of a professional service corporation to maintain a current certificate of registration was enacted to protect the public safety." *Id*.

The Illinois Supreme Court case of *Grody v. Scalone*, 96 N.E.2d 97 (Ill. 1950), also bears on the matter at hand.  In *Grody*, the plaintiff failed to register his assumed business name in violation of the Illinois Assumed Name Act.  The defendant alleged that in failing to do so, the plaintiff was in business unlawfully and therefore could not legally enforce a contract.  The court held that because the statute already expressly provided a penalty for conducting business in violation of the Illinois Assumed Name Act, the contract made in violation of the Act would not be held void as an additional penalty.  *Paddock, Inc. v. Glennon*, 32 Ill. 2d 51 (1965), also

supports the position that even though a corporation violates an act's registration requirement, as long as the owner of the corporation was licensed, the contract should not be voided. As the Court recognized, although "a contract made by an unlicensed individual calling for his personal services, or by a firm having no licensed officer or employees, is unenforceable * * * an unlicensed owner or firm may contract for the performance of services by licensed individuals." *Id*. at 54.

*Grody*, *Paddock*, *Chatham Foot Specialists*, and *Hattis* all suggest that the Illinois Supreme Court would find that the contract made by the unlicensed K2 corporation should not be voided because the corporation's principal was a licensed architect. Following the reasoning of the *Hattis* court, the purpose of the Act is not to protect architects, but to protect the public from possible damage resulting from the work of incompetent and unlicensed architects. Because Kupritz was a licensed architect at all relevant times, allowing his business to contract for services provided by a licensed architect would not defeat the policy behind the statute. See also *Parkman & Weston Asso., Ltd. v. Ebenezer African Methodist Episcopal Church*, 2003 WL 22287358, at *3 (N.D. Ill. Sept. 30, 2003). Accordingly, the Court concludes that Plaintiffs have not shown that K2's failure to maintain its registration as a professional design firm renders the Owner/Architect Agreements void.

Plaintiffs also argue that the second agreement's identification of the contracting party as "K2" in lieu of K2's full corporate name, "K2 Architects, Inc.," renders the agreement void. However, under Illinois law, a contract "must be construed to give effect to the intention of the parties." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). Moreover, "the signature of a corporate officer may be effective as the signature of the corporation, even if the officer fails to indicate his corporate affiliation." *People ex rel. City of Prospect Heights v.*

*Village of Wheeling*, 147 Ill. App. 3d 838, 840-41 (1st Dist. 1986). Looking at the agreement, it seems clear that Kupritz signed it in his representative capacity as a principal of the corporation, K2 Architects, Inc. The agreement specifically identifies the architect's "designated representative" as "Philip Kupritz, K2 Architects, Inc.," and Kupritz signed the agreement as "principal" of the architect. Furthermore, the first agreement provided that it was between Blythe Holdings and "K2 Architects, Inc." (listing the same address as listed in the second agreement). See also *Parkman & Weston*, 2003 WL 22287358, at *3. Given the prior course of dealing between the parties (with respect to the first agreement), as well as the designations on the face of the contract, the Court finds that the parties intended the contract to be between Blythe and Kupritz's corporate affiliation, K2 Architects, Inc., and the Court will not void the contracts between the parties because of K2's failure to identify its full corporate name on the first page of the second agreement.

The Owner/Architect Agreements contain valid mediation and arbitration provisions. Plaintiffs' claims against the K2 Defendants arise out of the relationship created by the agreements, and the Court rejects Plaintiffs' arguments that the agreements are void. Therefore, the Court stays proceedings against the K2 Defendants and compels mediation/arbitration of Plaintiffs' claims.

### B.     The Lawyers' Motions to Dismiss

According to the complaint, Plaintiffs hired attorney John DeAngelis on the recommendation of the Flawless Defendants to assist Plaintiffs in completing the necessary applications for requesting lots through the City's redevelopment program. At the time of the alleged wrongdoing, Defendant DeAngelis was employed by the law firm of Brown, Udell & Pomerantz, Ltd., also a defendant in this case. On November 28, 2005, DeAngelis sent Hill a

letter on Brown Udell letterhead, the purpose of which was "to provide Blythe Holdings, Inc. ("you") and our firm with a written memorandum of the terms and conditions under which we will undertake to represent you." [DE 160, Ex. D]. The letter stated, "[a]s we have discussed, we will provide (both directly and through sub-consultants retained by us) such services in connection with the preparation, assembly, review and completion of an Application for Purchase of Property to the City of Chicago Department of Planning and Development * * *." The correspondence also provided that services would be rendered at a flat fee of $50,000 and was signed by John A. DeAngelis under the firm name of Brown, Udell & Pomerantz, Ltd. On December 1, 2005, Blythe paid DeAngelis the $25,000 retainer required by the agreement between Hill and Williams. Plaintiffs have alleged causes of action for legal malpractice, unjust enrichment, and equitable accounting against DeAngelis and the Brown Udell Defendants. DeAngelis and the Brown Udell Defendants have filed separate motions, seeking dismissal of all claims against them.

### 1. *Legal Malpractice*

Under Illinois law, to state a claim for legal malpractice a plaintiff must allege "(1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that 'but for' the attorney's negligence, the plaintiff would have prevailed in the underlying action; and (4) damages." *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 351 (1st Dist. 2000) (quoting *Serafin v. Seith*, 284 Ill. App. 3d 577, 586-87 (1996)); see also *Mihailovich v. Laatsch*, 359 F.3d 892, 904 (7th Cir. 2004). The proximate cause element requires that the plaintiff plead facts sufficient to demonstrate that "but for the attorney's malpractice, the client would have been successful in the undertaking the attorney was retained to perform." *Owens*,

316 Ill. App. 3d at 351. "If the harm would have resulted irrespective of such negligence, then the negligence is not a substantial factor or cause-in-fact." *Carmel v. Clapp & Eisenberg, P.C.*, 960 F.2d 698, 703 (7th Cir. 1992). Both DeAngelis and the Brown Udell Defendants argue that Plaintiffs have failed to adequately plead the proximate cause element of their malpractice claim. Plaintiffs argue that they have adequately apprised Defendants of the nature of their claims against them, satisfying their obligations under Rule 8.

In their complaint, Plaintiffs alleged that DeAngelis, as an agent/employee of Brown Udell, failed to timely complete the application to the City of Chicago for the acquisition of the lots at issue (and that his firm failed to adequately supervise him) and failed to avoid and disclose conflicts of interest. Plaintiffs also have alleged that they were injured as a "direct and proximate result" of DeAngelis' and Brown Udell's errors relating to the preparation of Plaintiffs' application for the lots. While Plaintiffs have alleged several "negligent act[s] or omission[s]" which could constitute a breach of duty in the attorney-client context, they do not allege that "but for" the actions of the lawyer defendants, they would have been successful in acquiring and developing the 400 lots in the 16th Ward. For example, while the complaint alleges that DeAngelis "[f]ailed to diligently devote [his] time and energy in completing an application for the acquisition of the lots," Plaintiffs do not allege that they would have been successful in obtaining the lots had the application been timely completed. The absence of this sort of allegation appears to be strategic in light of the other allegations in the complaint and the history of this case. The thrust of the complaint is that Plaintiffs failed to acquire the lots at issue because they were victimized by a scheme to defraud them. The scheme was allegedly devised by Williams and her companies and made possible by Coleman's alleged "control" over the City's vacant lot redevelopment program in the 16th Ward. To sufficiently plead a legal

malpractice claim, Plaintiffs would have to allege that had DeAngelis, acting under the supervision of Brown Udell, timely completed the necessary application for the acquisition of the lots, then the transaction would have proceeded. However, because Plaintiffs no longer allege that any of the lawyer defendants were part of the RICO scheme (as Plaintiffs alleged in their initial complaint), this allegation would run contrary to Plaintiffs' other allegations – that Coleman and the Williams Defendants created a scheme intended to defraud Plaintiffs from the start. See *Taylor v. Chicago Police Dep't*, 2008 WL 2477694, at *2 (N.D. Ill. June 18, 2008) ("a plaintiff can plead himself or herself out of court by pleading facts that undermine the allegations set forth in the complaint"). For these reasons, Plaintiffs' legal malpractice claims, as currently pled, cannot survive and are dismissed without prejudice.

### 2. *Unjust Enrichment*

To state a cause of action based on a theory of unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160 (1989). DeAngelis argues that Plaintiffs have not set forth sufficient allegations of wrongdoing by DeAngelis, and the Brown Udell Defendants argue that they have not retained any "benefit" to Plaintiffs' detriment.

Plaintiffs have alleged that they gave a $25,000 retainer to DeAngelis and that DeAngelis did not represent their interests or provide the services that were agreed upon. Those allegations, if proven, arguably could amount to a violation of fundamental principles of justice, equity, and good conscience. Accordingly, Plaintiff has satisfied the pleading requirements for a claim of unjust enrichment against DeAngelis.

With respect to the Brown Udell Defendants, Plaintiffs have alleged that they paid a $25,000 retainer to DeAngelis and that DeAngelis was the servant/employee of Brown Udell. Also, the November 28 letter that DeAngelis sent to Hill, which set forth the fee agreement, was on Brown Udell letterhead and signed by John A. DeAngelis *under the firm name of Brown, Udell & Pomerantz, Ltd*. These allegations, coupled with the allegations that Plaintiffs paid a $25,000 retainer to DeAngelis and that DeAngelis was employed by Brown Udell at the time payment was rendered, are sufficient to state a claim of unjust enrichment against the Brown Udell Defendants.[7]

### 3. Equitable Accounting

"An equitable accounting is an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Triple Canopy, Inc. v. Moore*, 2005 WL 1629768, at *5 (N.D. Ill. July 1, 2005). To state a claim for an accounting under Illinois law, the plaintiff must allege "the absence of an adequate remedy at law and at least one of the following: (1) a breach of fiduciary relationship between the parties, (2) fraud, (3) a need for discovery, or (4) the existence of mutual accounts which are complex in nature." *Id.* (quoting *Wausau Ins. Co. v. Woods Equip. Co*., 2002 WL 398542, at *4 (N.D. Ill. Mar. 14, 2002)). Plaintiffs have not alleged the absence of an adequate remedy at law; instead, they have only alleged monetary damages. While Rule 8(d)(2) permits a Plaintiff to plead two theories in the alternative, Plaintiffs here have not sufficiently done so. See Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim * * * alternatively or hypothetically, either in a

---

[7] The Court is cognizant of the Brown Udell Defendants' argument that the legal malpractice claims against the individual Brown Udell Defendants – Brown, Pomerantz, and Udell – should be dismissed. However, Defendants have failed to cite any legal authority supporting their position that the law firm, rather than the individual partners, is the proper defendant is a lawsuit such as this. Accordingly, the Court will not dismiss the individual Brown Udell Defendants at this time.

single count * * * or in separate ones.").  Accordingly, Count IX is dismissed without prejudice. See *Thorpe v. Levenfeld*, 2005 WL 2420373, at *5-6 (N.D. Ill. Sept. 29, 2005).

### C. Coleman's Motion to Dismiss

Plaintiffs' suit against Coleman alleges participation in a RICO conspiracy, fraud, breach of fiduciary duty, unjust enrichment, and common law conspiracy and seeks damages, a constructive trust, and an equitable accounting.  According to Plaintiffs, their claims against Coleman arise from a RICO enterprise that stole over half a million dollars from Plaintiffs.  In her motion to dismiss, Coleman argues that Plaintiffs lack standing to bring their RICO claims and that Plaintiffs have failed to sufficiently plead a § 1962(c) violation and in turn cannot maintain a § 1962(d) conspiracy claim.  Coleman does not contest the viability of the state law claims except to argue that the Court should decline to exercise supplemental jurisdiction over those claims.

#### 1. Standing

As an initial matter, Coleman contends that Plaintiffs do not have standing pursuant to § 1962(c) to bring their RICO claims because of the six predicate acts upon which the RICO claims are based, four of them occurred before Blythe was incorporated in Nevada, and all of them occurred before Chicago 100 was incorporated in Illinois.  Coleman fails to cite any legal authority to support this position.  In their complaint, Plaintiffs allege that Blythe is a Nevada corporation, which originally was incorporated in Oregon and which currently has its principal place of business in California.  Plaintiffs also allege that Chicago 100, Inc. was incorporated as the successor in interest to Blythe, pursuant to the advice of Defendants DeAngelis and Williams.

The Court is unaware of any authority, and Coleman has not provided any, for the proposition that Coleman asserts – mainly, that Plaintiffs do not have standing to bring their RICO claims because Blythe "switched" its state of incorporation from Oregon to Nevada but did so after some of the alleged predicate acts occurred.[8] "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived * * *." *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000). The Court does not have a duty to research and construct legal arguments available to a party (see *Head Start Family Educ. Program, Inc. v. Coop Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995), and declines to do so in this instance.

2.      *RICO*

Count II alleges a civil conspiracy among the Flawless Defendants and Shirley Coleman to violate RICO. The RICO conspiracy statute provides:   "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). The Flawless Defendants and Shirley Coleman are accused of conspiring to violate subsection (c), which makes it unlawful for "any person employed by or associated with [an] enterprise * * * to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim for a violation of RICO under 18 U.S.C. § 1962(c), Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima v. Imrex Co.,* 473 U.S. 479, 496 (1985) (footnote omitted). A pattern is the commission

---

[8]   In their response brief, Plaintiffs argue that even if Blythe or Chicago 100 came into existence as a corporation after some of the events alleged to have occurred, it would not disrupt its current status as a corporation. Plaintiff cites to *Acorn Lumber Co. v. Friedlander Box Co.*, 240 Ill. App. 425 (1st Dist. 1926), as support for its proposition that every corporation that comes into existence through the actions of the incorporators is subsumed by the subsequent authorization to transact business when a charter is issued. Although tangentially related, *Acorn Lumber* does not directly address the current issue before the Court.

of at least two statutorily enumerated "predicate acts." See *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 965 (7th Cir. 2000).

To state a claim for conspiracy under § 1962(d), a plaintiff must allege "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 732 (7th Cir. 1998) (footnote omitted). The complaint need not allege that each defendant agreed personally to commit two predicate acts but rather need only allege that each defendant agreed to "participate in an endeavor which, if completed, would constitute a violation of" RICO. *Id.* at 731-32. "One must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." *Brouwer*, 199 F.3d at 967. The Seventh Circuit also has cautioned "that the broad construction of the RICO conspiracy provision should not be used by the courts 'to criminalize mere association with an enterprise.'" *Id.* at 732 (quoting *United States v. Neapolitan,* 791 F.2d 489, 498 (7th Cir. 1986)). Thus "in order to plead a viable § 1962(d) claim," a plaintiff must allege that the defendants "'agreed to the objective of a violation of RICO.'" *Goren*, 156 F.3d at 732 (citing *Neapolitan,* 791 F.2d at 498).

Plaintiffs' complaint alleges that Coleman and Flawless agreed to work together and with others to use false and fraudulent pretenses, representations, and promises to defraud Plaintiffs. According to the complaint, Coleman was present at a meeting between Hill, Williams, and Willie Miles in October 2005, during which Coleman confirmed representations made by Williams and Flawless and advised Hill that the redevelopment program was a legitimate

program.  Plaintiffs also allege that Coleman told Hill that Blythe would have to enter into an agreement with Flawless to accomplish the project.

According to the complaint, Coleman also wrote letters to Blythe to fulfill her role in the conspiracy.  Specifically, the complaint alleges that on November 21, 2006, and December 12, 2006, Coleman wrote letters to Blythe to induce it to transfer funds to Flawless under false pretenses.  The November letter thanked Blythe for its interest in the project and affirmed the qualifications of the Flawless Defendants, DeAngelis, and Kupritz.  The December letter "confirm[ed]" and "approv[ed]" the agreement between Flawless and Blythe and included a list of the 100 lots that had been "reserved" in the first phase of the redevelopment plan.  Plaintiffs also allege that Coleman received economic benefits from the activities of Williams and the Flawless enterprises [¶ 98].  According to the complaint, Flawless directed $50,000 of the funds received from Blythe to Coleman's church and used other funds to pay for Coleman's interior decorator.

These allegations, at this stage, suffice to show at least *an agreement* on Coleman's part to work with the Flawless Defendants in their endeavors.  See *Salinas v. United States*, 522 U.S. 52, 64-65 (1997).  However, whether she "agreed to the objective of a violation of RICO" is another issue.  *Goren*, 156 F.3d at 732.  If a plaintiff's RICO claim under § 1962(c) fails to plead a violation, the RICO conspiracy claim based on the same facts must fail as well.  See *Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 677 (7th Cir. 2000); see also *Meier v. Musburger*, 2008 WL 5135853, at *25 (N.D. Ill. Dec. 8, 2008) ("Since a pattern of racketeering activity is RICO's key requirement, an agreement to commit acts that do not constitute a pattern cannot be an agreement to violate RICO") (internal citations omitted).  Thus, even if Plaintiffs can satisfy the pleading requirements for a conspiracy claim against Coleman, the Court must assess

whether Plaintiffs have alleged a RICO claim under § 1962(c). The Court's analysis of this issue, however, is substantially hindered by the fact that the only Defendants alleged to have violated § 1962(c) are the Flawless Defendants, who have not answered Plaintiffs' first amended complaint and who are subject to an entry of default entered by separate order of the Court. Instead of arguing the viability of Plaintiffs' RICO claim against the Flawless Defendants, Coleman argues that Plaintiffs failed to adequately plead a § 1962(c) claim against Coleman. Coleman addresses the elements of a § 1962(c) claim as they might pertain to her, but not as they pertain to the Flawless Defendants. And Plaintiffs correctly respond that they are not alleging a § 1962(c) claim against Coleman; rather, they only allege a § 1962(d) conspiracy claim against her and a § 1962(c) claim against the Flawless Defendants. As set forth above, the Court does not have a duty to research and construct legal arguments available to a party. See *supra* Section C.1. Because (i) the allegations are sufficient to find an agreement on Coleman's part and (ii) Coleman did not brief the issue of whether Plaintiffs have adequately pled a valid underlying claim, the Court denies Coleman's motion to dismiss.

**IV.     Conclusion**

For these reasons, the Court grants in part and denies in part the K2 Defendants' motion to dismiss or stay proceedings and compel arbitration [164], denying the motion as to the request to dismiss but granting the motion to compel arbitration and staying proceedings as to the K2 Defendants.  The Court grants in part and denies in part Defendant John DeAngelis' motion to dismiss [182], and the Court also grants in part and denies in part the Brown Udell Defendants' motion to dismiss [188].  In particular, as to the lawyer Defendants, the Court denies the motions on Plaintiffs' unjust enrichment claims and grants the motions on Plaintiffs' legal malpractice and equitable accounting claims.  The Court denies Defendant Shirley Coleman's motion to dismiss [177].

Dated:  January 15, 2008

_____
Robert M. Dow, Jr.
United States District Judge