## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BLYTHE HOLDINGS, INC. and CHICAGO 100, INC.,

                Plaintiffs,

v.

FLAWLESS FINANCIAL CORPORATION, FLAWLESS FINANCIAL MORTGAGE CORPORATION, TRACY WILLIAMS, TRACY WILLIAMS d/b/a FLAWLESS FINANCIAL, TRACY WILLIAMS d/b/a FLAWLESS FINANCIAL MORTGAGE CORPORATION, SHIRLEY COLEMAN, JOHN A. DEANGELIS, MICHAEL BROWN, GLENN UDELL, MICHAEL POMERANTZ, BROWN, UDELL and POMERANTZ, LTD., PHILLIP A. KUPRITZ, PHILLIP A. KUPRITZ d/b/a K2, PHILLIP A. KUPRITZ d/b/a K2 STUDIO, PHILLIP A. KUPRITZ d/b/a K2 ARCHITECTS, INC., PHILLIP A. KUPRITZ d/b/a CION COMPANIES, INC., K2 ARCHITECTS, INC., and CION COMPANIES, INC.,

                Defendants.

No. 06 C 5262

Hon. Robert M. Dow, Jr.

## THE BROWN UDELL DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Terry D. Weissman
Kyle D. Rettberg
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Suite 1700
Chicago, IL 60602-3801
(312) 269-8000

*Attorneys for Defendants Michael I. Brown, Glenn L. Udell, Michael S. Pomerantz, and Brown Udell and Pomerantz, Ltd.*

Defendants Michael I. Brown, Glenn L. Udell, Michael S. Pomerantz, and Brown Udell and Pomerantz, Ltd. (the "Brown Udell Firm," and, together with Messrs. Brown, Udell, and Pomerantz, the "Brown Udell Defendants"), respectfully submit this memorandum of law in support of their motion for summary judgment on all claims alleged against them.

## INTRODUCTION

Plaintiffs' claims against the Brown Udell Defendants for legal malpractice (Eleventh and Twelfth Claims for Relief) and unjust enrichment (Seventh Claim for Relief) fail for several independent reasons.

*First*, Plaintiffs have brought forth no evidence upon which a jury could reasonably find causation to support a claim for legal malpractice. That is, Plaintiffs cannot establish that some act of legal malpractice prevented them from successfully completing the acquisition and development of 100 lots from the City of Chicago. To the contrary, the undisputed facts establish that: (i) the lots at issue were still available to be purchased by Plaintiffs long after Plaintiffs filed this suit – the lots were thus never "lost" due to some alleged act of malpractice; (ii) none of the alleged acts of malpractice created an uncorrectable legal impediment or bar to Plaintiffs' acquisition of the lots; (iii) Plaintiffs had sufficient funds to acquire the lots even after the alleged "malpractice" and could have acquired the lots but simply did not utilize those funds for that purpose; and (iv) Plaintiffs have offered no evidence that they would have successfully completed the numerous additional steps required to complete the acquisition of lots from the City. Accordingly, Plaintiffs cannot establish that they would have successfully acquired and developed the lots at issue but for some act of legal malpractice by the Brown Udell Defendants, and thus summary judgment should be entered on both of Plaintiffs' claims for legal malpractice.

*Second*, Plaintiffs' legal malpractice claim against the Brown Udell Defendants based on an alleged failure to adequately supervise John DeAngelis (Twelfth Claim for Relief) also fails

for the independent reason that it is unsupported by any expert opinion establishing the relevant standard of care for the supervision of an attorney or how the Brown Udell Defendants purportedly breached that standard. The failure to offer expert testimony concerning the standard of care for supervising an attorney is fatal to Plaintiffs' claim as a matter of law.

*Third*, summary judgment should be entered against Plaintiffs on their request for lost profit damages. Under Illinois law, a new business generally cannot recover for lost profits and thus the courts routinely enter summary judgment on such claims. Here, it is undisputed that Plaintiffs are both new businesses that have never generated any revenue or profits whatsoever. Plaintiffs' estimates of anticipated profits per lot, moreover, are based entirely upon mere speculation and conjecture which are not supported by any expert analysis regarding the profitability of developing low income housing in Chicago in the second of half of 2006, 2007 or 2008. Accordingly, the demand for lost profits should be dismissed.

*Finally*, Plaintiffs' claim for unjust enrichment (Seventh Claim for Relief) against the Brown Udell Defendants fails because there is no evidence that the Brown Udell Defendants ever received any "benefit" from Plaintiffs, much less unjustly retained such a benefit. Absent such evidence of an "unjustly retained benefit," no claim for Unjust Enrichment can be demonstrated.

Accordingly, it is respectfully submitted that summary judgment should be entered dismissing all claims alleged against the Brown Udell Defendants.

## FACTUAL BACKGROUND

### I. Overview of Claims

Plaintiffs Blythe Holdings, Inc. ("Blythe") and Chicago 100, Inc. ("Chicago 100") (together, "Plaintiffs") allege that they were the victims of a "real estate based scheme to defraud investors" in connection with the redevelopment of vacant lots in the 16th Ward of Chicago.

(The Brown Udell Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("SOF") ¶ 7). The primary alleged participants in this scheme were defendants Tracy Williams, her company, Flawless Financial ("Flawless"), and former 16th Ward Alderman Dorothy Coleman. (SOF ¶ 8). In general, Plaintiffs allege that they paid $465,000 to Williams or Flawless in connection with the proposed acquisition of 400 lots from the City of Chicago, but never acquired the lots at issue. (SOF ¶ 9).

In addition to asserting various claims against the alleged active participants in the scheme, Plaintiffs have also brought a claim for legal malpractice against the attorney retained to represent them in connection with the proposed transaction, John DeAngelis. (1st Am. Cmplt., Eleventh Claim for Relief). Plaintiffs assert that same legal malpractice claim against the Brown Udell Firm, where DeAngelis was employed at the time of his alleged malpractice, and the individual shareholders of the Firm. (*Id.*) Plaintiffs further assert a separate legal malpractice claim against the Brown Udell Defendants on the theory that their supervision of DeAngelis was inadequate. (*Id.*, Twelfth Claim for Relief).

## II. Retainer Payment To DeAngelis

Stephanie Hill is the owner and sole employee of Blythe, a business that she formed in 2005 in order to pursue the acquisition and development of 400 vacant lots from the City of Chicago. (SOF ¶ 12). In late November 2005, Hill retained DeAngelis to represent Blythe in connection with the proposed transaction. (SOF ¶ 15). On November 29, 2005, Hill counter-executed a retainer agreement that had been signed by DeAngelis. (SOF ¶ 16). Although the retainer agreement was on letterhead of the Brown Udell Firm, DeAngelis did not ever inform any of the Brown Udell Defendants that he had agreed to represent Blythe. (SOF ¶ 16).

On or about December 1, 2005, Blythe paid a $25,000 retainer fee directly to DeAngelis with a check made payable to "JOHN DEANGELIS ESQ." (SOF ¶ 17). DeAngelis deposited

that check in the "John A DeAngelis Client Fund Account" at the Northern Trust Company ("Northern Trust"). (SOF ¶ 18). The Brown Udell Defendants had no control over that account. (SOF ¶ 18). Moreover, DeAngelis never shared any portion of the $25,000 retainer with any of the Brown Udell Defendants, and did not inform the Brown Udell Defendants of his receipt of that retainer payment. (SOF ¶ 19). Plaintiffs never had any contact with any attorney at the Brown Udell Firm other than DeAngelis. (SOF ¶20).

## III.  Transfer of Funds To Flawless

On December 20, 2005, two investors in Blythe transferred a total of $250,000 to the John A. DeAngelis Client Fund Account at Northern Trust. (SOF ¶ 21). DeAngelis did not inform any of the Brown Udell Defendants of his receipt of this transfer. (SOF ¶ 22). On December 21, 2005, DeAngelis caused $249,978 to be wired from the John A. DeAngelis Client Fund Account to an account at LaSalle Bank, N.A. that was held in the names of Flawless Financial and Tracy Williams. (SOF ¶ 23). Prior to making that transfer, DeAngelis received a letter from Stephanie Hill stating that Blythe would be transferring $270,000 to "your Trust Account" and that:

> These funds are to be disbursed immediately in two separate payments in the following manner:
>
> 1)      $250,000 to Flawless Financial as final payment for the 100 residential lots provided by the City of Chicago and deeded to Blythe Holdings, Inc, as outline in the attached Exhibit A.

(SOF ¶ 24).

## IV.  DeAngelis' Submission of an Application

On or about May 12. 2006, DeAngelis submitted an Application for Purchase of Redevelopment Project Area Property (the "Application") to the City Department of Planning and Development on behalf of Chicago 100, an entity that was formed by Stephanie Hill in 2006

in connection with the proposed transaction. (SOF ¶¶ 25-27). Although the application contained certain errors, each of those errors was correctable, and none was fatal to the proposed acquisition. (SOF ¶¶ 28-29).

## V. The Infusion of $250,000 to Plaintiffs

In mid-May 2006, one of Plaintiffs' investors, Stephen Forte, provided Plaintiffs with an additional $250,000 to pursue the acquisition of lots from the City. (SOF ¶ 30). The $250,000 that Forte contributed in mid-May 2006 had been depleted in its entirety by June 2006. (SOF ¶ 31). None of Plaintiffs' witnesses could explain what had happened to those funds. (SOF ¶ 32).

## VI. Plaintiffs' Abandonment of the Acquisition

On June 14, 2006, Michelle Nolan of the City Department of Planning and Development wrote to Stephanie Hill to outline various additional steps that Plaintiffs would have to take in order to acquire the lots at issue from the City. (SOF ¶ 35). Thereafter, Plaintiffs made no further efforts to pursue the transaction. (SOF ¶ 36). As of April 2008, the lots that Plaintiffs had sought to acquire were still available to be purchased by from the City by Plaintiffs. (SOF ¶ 37).

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Although the party seeking summary judgment

has the burden of establishing the lack of any genuine issue of material fact, summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).*Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

## ARGUMENT

### I.     Plaintiffs' Legal Malpractice Claims Fail Because They Cannot Prove Causation

Under Illinois law, a legal malpractice plaintiff is required to prove "proximate cause establishing that 'but for' the attorney's negligence, the plaintiff would have prevailed in the underlying action." *Blythe Holdings Inc. v. Flawless Financial Corp.*, 2009 WL 103196, at *12 (N.D. Ill. Jan. 15, 2009), quoting *Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 155 (Ill. App. Ct. 2000). In connection with a transactional engagement, the plaintiff must prove that "but for the attorney's malpractice, the client would have been successful in the undertaking the attorney was retained to perform." *Id.*, quoting *Owens*, 736 N.E.2d at 155.

In this case, this Court previously ruled that in order to satisfy the causation requirement, Plaintiffs would need to prove that "'but for' the actions of the lawyer defendants, they would have been successful in acquiring and developing the 400 lots in the 16th Ward." *Id.* at *13. In dismissing the legal malpractice claims in Plaintiffs' first amended complaint, this Court noted that any allegation to that effect would be contrary to "the thrust of the complaint" which was "that Plaintiffs failed to acquire the lots at issue because they were victimized by a scheme to

6

defraud them." *Id.* Thereafter, in response to Plaintiffs' submission of the "First Amendment to the First Amended Complaint," the Court found that, for pleading purposes, Plaintiffs had adequately *alleged* two theories of causation: (i) that but for the attorney defendants' "failure to actively pursue the [first] 100 lots on Plaintiffs' behalf in a timely fashion," "Plaintiffs would have obtained, developed and sold the lots;" and (ii) that but for the transfer of $250,000 from DeAngelis' client trust account to Flawless and Williams, Plaintiffs would have been successful in "the purchase of the first 100 lots." (7/22/09 Minute Order at 3-4). Summary judgment should now be entered against Plaintiffs because they have not brought forth evidence sufficient to support either of those theories.

### A. There Is No Evidence That The Timeliness Of The Application Prevented Plaintiffs From Acquiring The Lots, Which Are Still Available

There is no evidence that the *timing* of DeAngelis' submission of the Application to the City on behalf of Plaintiffs somehow precluded Plaintiffs from acquiring the lots from the City. There is no evidence that any deadline for the Application was missed or that the lots at issue were sold to another buyer because DeAngelis failed to submit the Application in a timely fashion. To the contrary, the undisputed testimony is that the lots at issue were still available years after Plaintiffs filed this suit. (SOF ¶ 37). These facts alone fatally undermine any claim that some untimely action precluded Plaintiffs from completing the transaction.

### B. Any Errors In The Application Were Correctable And Did Not Create A Legal Impediment To Plaintiffs Acquiring The Lots

The record is also devoid of any evidence that any alleged errors in the Application that was submitted by DeAngelis were somehow legally fatal to Plaintiffs' ability to complete the transaction. To the contrary, the undisputed testimony of both Michelle Nolan and Plaintiffs' own expert witness is that to the extent that there were mistakes in the Application submitted by DeAngelis on Plaintiffs' behalf, those mistakes could have been corrected. (SOF ¶¶ 28-29). The

transaction thus remained legally viable when Plaintiffs initiated this lawsuit in September 2006. Under such circumstances, Plaintiffs cannot demonstrate causation as a matter of law. *See Mitchell v. Schain, Fursel & Burney, Ltd.*, 773 N.E.2d 1192, 1195 (Ill. App. Ct. 2002) ("There is no question that plaintiff's cause of action was viable, as a matter of law, well after defendants were discharged and successor counsel was retained. It therefore follows that defendants' alleged negligence did not cause plaintiff's damages, the loss of a viable cause of action.").

### C.  There Is No Evidence That The Transfer Of Funds Prevented Plaintiffs From Acquiring The Lots

Plaintiffs also cannot establish that they were prevented from completing the acquisition and development of the lots due to the transfer of $250,000 of Plaintiffs' funds from DeAngelis' client trust account to Williams and Flawless.[1] To the contrary, the undisputed testimony is that in mid-May, 2006, nearly six months *after* the transfer of $250,000 to Williams and Flawless, a Blythe investor, Stephen Forte, provided Plaintiffs with an *additional* $250,000 to pursue the acquisition of the lots. (SOF ¶ 30). There is no evidence in the record, however, showing that those funds were in any way actually used to pursue the acquisition of the lots from the City. Rather, Plaintiffs' President, Stephanie Hill, testified that the $250,000 that Forte contributed in mid-May 2006 had been depleted in its entirety by June 2006. (SOF ¶ 31). Hill could not recall what she did with those funds. (SOF ¶ 32). John Jones, Plaintiffs' "financial consultant," similarly could not identify how those funds had been used. (SOF ¶ 32). Nor could Forte. (SOF

---

[1] As an initial matter, the proposition that the transfer caused the transaction to fail is directly contrary to Plaintiffs' other theory of causation. In particular, in asserting that "the attorney's failure to complete the requisite paperwork prevented the real estate transaction from moving forward" (7/22/09 Minute Order at 3-4), Plaintiffs contend that they could have completed the transaction "[e]ven with the loss of ... the payment of $500,000." (1st Am. to 1st Am. Cmplt., ¶236). (The referenced payment of $500,000 by Plaintiffs includes the $250,000 that was transferred to Flawless and Williams through DeAngelis' client trust account). (1st Am. Cmplt. ¶¶ 192-193). Plaintiffs cannot claim both that they could have completed the acquisition of the first 100 lots despite Williams and Flawless absconding with the $250,000, and that the transfer of the $250,000 somehow precluded them from completing the acquisition.

¶ 32). In light of the infusion of an additional $250,000 to the project by Forte in mid-May 2006 – a time when the lots at issue were indisputably still available and there was no legal impediment to Plaintiffs acquiring them – Plaintiffs cannot possibly establish that the December 2005 transfer of $250,000 to Williams and Flawless prevented Plaintiffs from acquiring the lots. This is particularly true in light of the complete lack of any evidence that Plaintiffs in any way used the funds invested in May 2006 to pursue the acquisition of the lots, instead inexplicably "depleting" those funds in just a matter of weeks.

### D. Plaintiffs Have Offered Only Rank Speculation, Not Evidence, That They Would Have Acquired The Lots But For Some Act Of Legal Malpractice

Plaintiffs have offered no *evidence* – as opposed to rank speculation – that they would have successfully completed the acquisition of the lots if DeAngelis had "correctly" completed the Application in a timely manner and the original $250,000 had never been transferred to Flawless and Williams. There are numerous additional steps involved in completing an acquisition of lots from the City of Chicago beyond merely submitting an application and having the requisite funds available, including but not limited to the following:

> ➢ The City Department of Planning and Development must decide to recommend the proposal to the Community Development Commission;

> ➢ The Community Development Commission must then approve the recommendation;

> ➢ A Redevelopment Agreement must then be negotiated between the City and the Applicant; and

> ➢ The City Council must vote to approve the transaction.

(SOF ¶ 33). Each of the foregoing steps must be completed before a closing on the purchase of lots from the City is even possible.

Here, the evidence is undisputed that Plaintiffs did not complete *any* of these required steps, and Plaintiffs have brought forth no evidence that those steps would have been completed

successfully. To the contrary, Hill specifically testified that she has "no way of knowing" whether the necessary administrative and legislative approvals would have been granted or whether Plaintiffs would have been able to negotiate an acceptable redevelopment contract with the City. (SOF ¶ 34). Thus, Plaintiffs' contention that they would have been able to acquire the lots from the City but for some act of legal malpractice is based entirely on speculation, not evidence. Accordingly, Plaintiffs have failed to bring forth evidence sufficient to establish proximate causation, and summary judgment should be entered in favor of the Brown Udell Defendants on Plaintiffs' legal malpractice claims.

## II.    Plaintiffs' Supervisory Legal Malpractice Claim Fails

Plaintiffs' "Twelfth Claim for Relief" seeks to impose legal malpractice liability on the Brown Udell Defendants based on a purported failure to properly supervise DeAngelis. This claim fails not only because Plaintiffs cannot establish causation (as discussed above), but also because Plaintiffs have failed to offer any expert testimony in support of the supervision claim.

Under Illinois law, "[f]ailure to present expert testimony is usually fatal to a plaintiff's legal malpractice claim." *Barth v. Reagan*, 564 N.E.2d 1196, 1200 (Ill. 1990); *Ball v. Kotter*, 746 F. Supp. 2d 940, 950-51 (N.D. Ill. 2010). This rule applies because "lay jurors are not equipped to determine what constitutes reasonable care in professional conduct without measuring the actor's conduct against that of other professionals." *Ball*, 746 F. Supp. 2d at 951, quoting *Advincula v. United Blood Services*, 678 N.E.2d 1009, 1021 (Ill. 1996). The requirement that a plaintiff offer expert testimony applies with equal force to legal malpractice claims based on an alleged failure to supervise. *See McLister v. Epstein & Lawrence, P.C.*, 934 P.2d 844, 847-48 (Colo. App. 1996) ("Because plaintiff failed to offer expert testimony concerning the standard of care for supervising attorneys in order for the jury to determine whether [defendant's] conduct deviated from that standard, the court properly dismissed the

claim against [defendant]"); *Bajwa v. Foster*, 2007 WL 2245801, at *4 (Minn. Ct. App. Aug. 7, 2007) (failure to introduce expert testimony defeated claim for negligent supervision of attorney).

Here, Plaintiffs have offered no expert opinion regarding the standard of care that applies to the supervision of an attorney in connection with an engagement of this type, nor have they offered any expert opinion as to how the Brown Udell Defendants purportedly breached such standard of care. The report of Plaintiffs' sole proffered expert, Prof. Leonard Gross, is silent as to supervisory issues, and during his deposition Prof. Gross expressly disclaimed any intent to opine on supervisory issues at trial. (SOF ¶¶ 47-48). Plaintiffs' failure to introduce any expert testimony in support of their contention that the Brown Udell Defendants committed legal malpractice by failing to properly supervise DeAngelis is fatal to that claim. Accordingly, summary judgment should be entered in favor of the Brown Udell Defendants on Plaintiffs' "Twelfth Claim for Relief."

## III. Plaintiffs Cannot Recover Lost Profits

In connection with their legal malpractice claims, Plaintiffs seek to recover "lost profits on the failed real estate deal that Plaintiffs allege they would have realized separate and apart from the alleged scheme to defraud by Coleman, Williams, and Flawless." (7/22/09 Minute Order at 3-4). Here, Plaintiffs cannot recover such claimed lost profits as a matter of law.

Illinois law places sharp restrictions on the recovery of lost profits by a new business venture. "The general rule under Illinois law is that a new business has no right to recover lost profits." *TAS Distributing Co., Inc. v. Cummins Engine Co, Inc.*, 491 F.3d 625, 634 (7th Cir. 2007); *see also Stuart Park Assoc.'s Ltd. P'Ship v. Ameritech Pension Trust*, 846 F. Supp. 701, 715 (N.D. Ill. 1994) ("Typically in Illinois, a new business cannot recover for lost profits."). This "new business rule" is grounded on the fact that "expected profits of a new commercial

business are considered too uncertain, specific and remote to permit recovery." *TAS Distributing Co., Inc. v. Cummins Engine Co, Inc.*, 491 F.3d 625, 633 (7th Cir. 2007). Thus, "lost profits are normally recoverable only when a business was previously established." *Euroholdings Capital & Inv. Corp. v. Harris Turst & Savings Bank*, 602 F. Supp. 2d 928, 936 (N.D. Ill. 2009). "Prior success with a similar business generally does not provide ample information to calculate lost profits for a new business because conditions vary with each business venture." *Id.*

Although there are exceptions to Illinois' new business rule, those exceptions are limited to circumstances where there is specific evidence from which lost profits can be determined with an unusually high degree of certainty. For example, a new business may recover lost profits "[i]n situations where the plaintiff operated an established business at an identical location during the same time period as a party for whom profit information is available." *TAS Distributing*, 491 F.3d at 633. Absent such unusual circumstances, however, lost profits cannot be recovered. Accordingly, courts routinely enter summary judgment on claims for lost profits by new businesses. *See, e.g., TAS Distributing*, 491 F.3d at 633 (affirming entry of summary judgment against plaintiff who introduced evidence of competitor's sale of similar product); *Stuart Park*, 846 F. Supp. at 715 (entering summary judgment against plaintiff real estate developer seeking lost profits for development of new apartment complex); *U.S. Golf Sys., Inc. v. WPI Acquisition Corp.*, 1994 WL 225384, at *9 (N.D. Ill., May 24, 1994) (entering summary judgment because plaintiffs "have not provided sufficient evidence from which a jury could reasonably ascertain [a new joint venture's] lost future profits").

Here, it is undisputed that Plaintiffs Blythe and Chicago 100, Inc. were both new businesses. (SOF ¶¶ 12, 25). Neither ever made any profits. (SOF ¶¶ 13, 26). In fact, neither ever even generated any revenue. (SOF ¶¶ 13, 26). Under such circumstances, Plaintiffs' lost

profits claims are barred by Illinois' new business rule. Moreover, Plaintiffs have no evidence that would bring them within an exception to the new business rule. For example, Plaintiffs have not offered *any* expert testimony regarding damages, much less the type of expert testimony that has been deemed sufficient to overcome application of the new business rule on a motion for summary judgment. *See Euroholdings Capital*, 602 F. Supp. 2d at 937 (describing types of expert testimony that have been found sufficient to avoid application of new business rule).

Nor have Plaintiffs brought forth any factual evidence that even remotely comes close to being sufficient to override the new business rule. The limited factual testimony regarding Plaintiffs' claimed lost profits came from Stephanie Hill. Hill testified that Plaintiffs anticipated making a profit of $45,000 on each affordable living home sold, and $70,000 on each market value home sold.[2] Such conclusory testimony regarding the hoped-for profits of a new business is precisely the type of evidence that is insufficient as a matter of law to support a claim for lost profits under Illinois' new business rule. *See Stuart Park*, 846 F. Supp. at 716 (rejecting claim for lost profits by real estate developer based upon evidence regarding another entity's profit history).

---

[2]     Plaintiffs conducted no independent analysis to support these figures. Hill's profit estimates were based on the assumption that construction costs for the affordable living and market value homes would be approximately $110,000 each and $125,000 each, respectively, and that affordable living homes could be sold for $155,000 each and market value homes for $195,000 each. (SOF ¶ 39). The cost information was provided to Hill primarily by Jones. (SOF ¶ 40). Jones, who had been out of the home construction business for over 20 years at the time of this project, based his cost estimate on a conversation with a business associate who was involved in "panel homes" in "California, Las Vegas, Texas, the Gulf." (SOF ¶ 40) Jones made no effort to ascertain what actual construction costs would be in Chicago. (SOF ¶ 40) Hill also claimed that information from the project's architect, Phil Kupritz, supported the cost estimate. (SOF ¶ 41) Hill admitted, however, that she had no idea what, if any, analysis Kupritz had done, and that she had no idea whether or not any estimates provided by Kupritz were accurate. (SOF ¶ 41). Hill's assumption that she would be able to sell affordable housing homes for $155,000 was based on information that was provided to her by Tracy Williams and Alderman Coleman, parties that Plaintiffs have accused of fraudulent conduct. (SOF ¶ 42). Hill further admitted that Plaintiffs took no independent steps to verify what homes were selling for in the 16th Ward during the relevant time period. (SOF ¶ 42).

Here, Plaintiffs have offered far less evidence in support of their lost profits claim than what was deemed to be legally insufficient in the *Stuart Park* case. For example, Plaintiffs have not even attempted to point to the profit history of some other entity engaged in a similar business in the same area. To the contrary, Hill testified that she was unaware of any developers who made a profit building housing in low income areas in the second half of 2006, 2007, or 2008. (SOF ¶ 43). Just as the new business rule precluded the plaintiffs in the *Stuart Park* case from claiming lost profits in connection with its failed real estate development, Plaintiffs here cannot recover lost profits for their failed real estate development as a matter of law.

## IV. Plaintiffs' Unjust Enrichment Claim Fails

The Brown Udell Defendants are also entitled to summary judgment in their favor on Plaintiffs' claim for unjust enrichment. To prevail on such a claim under Illinois law, a plaintiff must prove "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)).

Here, Plaintiffs have no evidence that any of the Brown Udell Defendants retained any "benefit" to Plaintiffs' detriment. This Court previously found that Plaintiffs had adequately *alleged* a claim for unjust enrichment based on their payment of a $25,000 retainer fee to DeAngelis on the theory that such payment may have somehow also benefited the Brown Udell Defendants. *Blythe Holdings*, 2009 WL 103196 at *14. The evidence developed through discovery, however, establishes the following undisputed facts regarding the $25,000 retainer fee:

> ➢ The retainer fee was paid with a check made payable only to "JOHN DEANGELIS ESQ;"

14

➢ The retainer fee was deposited in the "John A DeAngelis Client Fund Account" at Northern Trust, an account over which the Brown Udell Defendants had no control;

➢ DeAngelis never shared any portion of the $25,000 retainer with any of the Brown Udell Defendants. (SOF ¶¶ 17-19).

Accordingly, the undisputed facts demonstrate that the Brown Udell Defendants did not receive, much less unjustly retain, any benefit as a result of Plaintiffs' payment of a $25,000 retainer fee to DeAngelis. Summary judgment should thus be entered in favor of the Brown Udell Defendants on Plaintiffs' claim for unjust enrichment.

## CONCLUSION

For all of the above reasons, the Brown Udell Defendants request that summary judgment in their favor be granted dismissing all claims as against them and that such other and further relief be granted as this Court may deem just and proper.

Respectfully submitted,

MICHAEL I. BROWN, GLENN L. UDELL, MICHAEL S. POMERANTZ, and BROWN UDELL AND POMERANTZ, LTD.

By:    /s/ Kyle D. Rettberg
        One of Their Attorneys

Terry D. Weissman
Kyle D. Rettberg
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Suite 1700
Chicago, IL  60602-3801
(312) 269-8000

## CERTIFICATE OF SERVICE

The undersigned, Kyle D. Rettberg, an attorney, hereby certifies that on Tuesday, September 27, 2011, he caused a true and accurate copy of the foregoing The Brown Udell Defendants Memorandum of Law in Support of Their Motion for Summary Judgment to be served upon all counsel of record by electronic filing.


                                        /s/ Kyle D. Rettberg
                                        Kyle D. Rettberg


NGEDOCS: 1842223.1