IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BLYTHE HOLDINGS, INC. and CHICAGO 100, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>FLAWLESS FINANCIAL CORPORATION, FLAWLESS FINANCIAL MORTGAGE CORPORATION, TRACY WILLIAMS, TRACY WILLIAMS d/b/a FLAWLESS FINANCIAL, TRACY WILLIAMS d/b/a FLAWLESS FINANCIAL MORTGAGE CORPORATION, SHIRLEY COLEMAN, JOHN A. DEANGELIS, MICHAEL BROWN, GLENN UDELL, MICHAEL POMERANTZ, BROWN, UDELL and POMERANTZ, LTD., PHILLIP A. KUPRITZ, PHILLIP A. KUPRITZ d/b/a K2, PHILLIP A. KUPRITZ d/b/a K2 STUDIO, PHILLIP A. KUPRITZ d/b/a K2 ARCHITECTS, INC., PHILLIP A. KUPRITZ d/b/a CION COMPANIES, INC., K2 ARCHITECTS, INC., and CION COMPANIES, INC.,<br><br>Defendants. | No. 06 C 5262<br><br>Hon. Robert M. Dow, Jr. |

**THE BROWN UDELL DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Terry D. Weissman
Kyle D. Rettberg
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Suite 1700
Chicago, IL 60602-3801
(312) 269-8000

*Attorneys for Defendants Michael I. Brown,
Glenn L. Udell, Michael S. Pomerantz, and
Brown Udell and Pomerantz, Ltd.*

Defendants Michael I. Brown, Glenn L. Udell, Michael S. Pomerantz, and Brown Udell and Pomerantz, Ltd. (together with Messrs. Brown, Udell, and Pomerantz, the "Brown Udell Defendants"), pursuant to Local Rule 56.1, respectfully submit this Statement of Undisputed Material Facts in support of their motion for summary judgment.

**Jurisdiction and Venue**

1. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965(a) because Plaintiffs have alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against parties other than the Brown Udell Defendants. This Court has supplemental jurisdiction over the Illinois state law claims asserted against the Brown Udell Defendants pursuant to 28 U.S.C. § 1367. Venue is proper in the Northern District of Illinois because Plaintiffs' allegations concern alleged conduct in Chicago, Illinois.

**Description of Parties**

2. Plaintiff Blythe Holdings, Inc. ("Blythe") is a Nevada corporation with its principal place of business in California. (1st Am. Cmplt. ¶ 7).

3. Plaintiff Chicago 100, Inc. ("Chicago 100") is an Illinois corporation with its registered office in Illinois. Chicago 100 was formed by the principals of Blythe in 2006. (1st Am. Cmplt. ¶ 8).

4. Defendant John DeAngelis is an Illinois-licensed attorney. He currently resides in Des Moines, Iowa. (Ex.[1] 1, DeAngelis Dep. I at 5:25 – 6:6; Ex. 2, DeAngelis Dep. II at 4:20-22).

5. Defendant Brown Udell & Pomerantz, Ltd. (the "Brown Udell Firm") is a corporation registered pursuant to the Illinois Professional Service Corporation Act, and has its

---

[1] The deposition transcripts and other materials submitted in support of the Brown Udell Defendants' Motion for Summary Judgment are contained in the Appendix of Exhibits in Support of the Brown Udell Defendants' Motion for Summary Judgment, which is cited herein as "Ex. __."

offices in Chicago, Illinois. (The Brown Udell Defendants' Answer & Affirmative Defenses To The First Amended Complaint, ¶ 16).

6. Defendants Michael I. Brown, Glenn L. Udell, and Michael Pomerantz are Illinois-licensed attorneys residing in Illinois. Each is also a shareholder of the Brown Udell Firm. (The Brown Udell Defendants' Answer & Affirmative Defenses To The First Amended Complaint, ¶ 16).

**Background**

7. Blythe and Chicago 100 allege that they were the victims of a "real estate based scheme to defraud investors" in connection with the redevelopment of vacant lots in the 16th Ward of Chicago. (1st Am. Cmplt., ¶ 75).

8. The primary alleged participants in this scheme were defendant Tracy Williams, her company, Flawless Financial ("Flawless"), and former 16th Ward Alderman Dorothy Coleman. (1st Am. Cmplt., ¶ 75-76).

9. Plaintiffs allege that they paid $465,000 to Williams or Flawless in connection with the proposed acquisition of 400 lots from the City of Chicago, but never acquired the lots at issue. (1st Am. Cmplt., ¶¶ 192-193).

10. In approximately October 2005, Stephanie Hill was approached regarding the possibility of acquiring and developing vacant lots in the 16th Ward of the City of Chicago from the City of Chicago. Tracy Williams and Alderman Coleman were to be involved in arranging the transaction for Hill. (Ex. 3, Hill Dep. at 64:6 – 68:24).

11. At the time, Hill did not have any experience as a real estate developer. (Ex. 3, Hill Dep. at 12:21 – 13:21, 14:5 – 16:3).

**Blythe**

12. Hill formed Blythe in 2005 in order to pursue the acquisition and development of the vacant lots from the City of Chicago. She is the sole owner of Blythe and at all relevant time was its sole employee. (Ex. 3, Hill Dep. at 19:3 – 20:2).

13. Blythe never made any profits. It also never generated any revenues through its business activities. (Ex. 3, Hill Dep. at 47:22 – 49:15).

14. On or about October 26, 2005, Blythe entered into a Consulting Contract with Flawless. Among other things, the Consulting Contract stated: "Developer [Blythe] agrees to pay legal fees for a total of $50,000 to the attorney recommended by Flawless Financial and deliver a retainer fee to begin the process." (Ex. 3, Hill Dep. at 105:18 – 107:6; Ex. 4).

**Blythe's Retention of DeAngelis**

15. Thereafter, Hill, acting on Williams' recommendation, retained DeAngelis to represent Blythe in connection with the proposed acquisition of 400 vacant lots from the City. (Ex. 3, Hill Dep. at 114:9-15).

16. On November 29, 2005, Hill counter-executed a retainer agreement that had been signed by DeAngelis. Although the retainer agreement was on letterhead of the Brown Udell Firm, DeAngelis did not inform any of the Brown Udell Defendants that he had agreed to represent Blythe. (Ex. 1, DeAngelis Dep. I at 57:16 – 58:2; Ex. D to 1st Am. Cmplt.; Ex. 5, DeAngelis' Response to the Brown Udell Defendant's Requests to Admit ¶¶ 1-5).

17. On or about December 1, 2005, Blythe paid a $25,000 retainer fee with a check made payable to "JOHN DEANGELIS ESQ." (Ex. 3, Hill Dep. at 122:10 – 123:23; Ex. 6).

18. DeAngelis deposited that check in the "John A. DeAngelis Client Fund Account" at the Northern Trust Company ("Northern Trust"). The Brown Udell Defendants had no control

over that account. (Ex. 5, DeAngelis' Response to the Brown Udell Defendant's Requests to Admit ¶¶ 12-17).

19. DeAngelis never shared any portion of the $25,000 retainer with any of the Brown Udell Defendants, and did not inform the Brown Udell Defendants of his receipt of that retainer payment. (Ex. 5, DeAngelis' Response to the Brown Udell Defendant's Requests to Admit ¶¶ 18-23).

20. Plaintiffs never had any contact with any attorney at the Brown Udell Firm other than DeAngelis. (Ex. 3, Hill Dep. at 254:21 – 255:9)

**Transfer of Funds To Flawless**

21. On December 20, 2005, two investors in Blythe transferred a total of $250,000 to the "John A. DeAngelis Client Fund Account" at Northern Trust. (Ex. 3, Hill Dep. at 142:17 – 143:24; Ex. 7).

22. DeAngelis did not inform any of the Brown Udell Defendants of his receipt of this transfer. (Ex. 5, DeAngelis' Response to the Brown Udell Defendant's Requests to Admit ¶¶ 39-40).

23. On December 21, 2005, DeAngelis caused $249,978 of the funds in the John A. DeAngelis Client Fund Account to be wired to an account at LaSalle Bank, N.A. that was held in the names of Flawless Financial and Tracy Williams. (Ex. 5, DeAngelis' Response to the Brown Udell Defendant's Requests to Admit ¶¶ 31-32).

24. Prior to making that transfer, DeAngelis received a letter from Hill stating that Blythe would be transferring $270,000 to "your Trust Account" and that:

> These funds are to be disbursed immediately in two separate payments in the following manner:

1) $250,000 to Flawless Financial as final payment for the 100 residential lots provided by the City of Chicago and deeded to Blythe Holdings, Inc, as outline in the attached Exhibit A.

(Ex. 3, Hill Dep. at 133:14 – 134:24; Ex. 8).

**Chicago 100**

25. In approximately mid-March 2006, Hill formed Chicago 100 in connection with the proposed acquisition of vacant lots from the City of Chicago. (Ex. 3, Hill Dep. at 56:8-12, 57:4-16, 58:12-15.).

26. Chicago 100 never made any profits. It also never generated any revenues through its business activities. (Ex. 3, Hill Dep. at 60:14-21).

**DeAngelis' Submission of an Application**

27. On or about May 12. 2006, DeAngelis submitted an Application for Purchase of Redevelopment Project Area Property (the "Application" )to the City Department of Planning and Development on behalf of Chicago 100. (Ex. 9, Nolan Dep. at 85:15-18, 124:16-126:2; Ex. 10).

28. Michelle Nolan of the City of Chicago Department of Planning and Development testified that although the Application submitted by DeAngelis contained certain errors, each of those errors was correctable, and none was fatal to the acquisition of the lots. (Ex. 9, Nolan Dep. at 183:21 – 184:5).

29. Plaintiffs' expert witness, Prof. Leonard Gross, confirmed Ms. Nolan's testimony that any errors in the Application submitted by DeAngelis were correctable and were not fatal to the proposed acquisition. (Ex. 11, Gross Dep. at 103:21 – 104:10).

**The Infusion of $250,000 to Plaintiffs**

30. In mid-May 2006, one of Plaintiffs' investors, Stephen Forte, provided Plaintiffs with an additional $250,000 to pursue the acquisition of lots from the City. (Ex. 3, Hill Dep. at 55:17 – 55:21).

31. The $250,000 that Forte contributed in mid-May 2006 had been depleted in its entirety by June 2006. (Ex. 3, Hill Dep. at 55:13-16).

32. None of Plaintiffs' witnesses could explain what had happened to the $250,000 that was invested by Mr. Forte in mid-May 2006. (Ex. 3, Hill Dep. at 55:22-24 ("Q: So between mid May of 2006 and June of 2006, what did you spend $250,000 on? A: I told you, I do not recall."); Ex. 12, Jones Dep. at 51:25 – 52:2 ("Q: Do you know what happened to Mr. Forte's second investment of $250,000? A: No."); Ex. 13, Forte Dep. at 155:23 – 156:4 ("Q: You don't know whether the money that you provided in May 2006, whether that went to anybody in Chicago; right? A: I don't know where it went. Q: Or whether it stayed in Las Vegas [where Hill resided], right? A: I don't know where it went.")).

**Administrative and Legislative Approvals Required for Acquisition**

33. There are numerous steps involved in completing an acquisition of lots from the City after submission of an application, including various administrative and legislative approvals. Those steps include but are not limited to the following: (i) the City Department of Planning and Development must decide to recommend the proposal to the Community Development Commission; (ii) the Community Development Commission must then approve the recommendation; (iii) a Redevelopment Agreement must then be negotiated between the City and the Applicant; and (iv) the City Council must vote to approve the transaction. (Ex. 9, Nolan Dep. at 19:20 – 22:16, 98:20 – 99:13; Ex. 14 at CI4 – CI5).

34. Blythe never took any of the additional requisite steps or obtained any of the requisite approvals. Blythe has no way of knowing if the requisite steps would have been completed successfully or if the necessary approvals would have been obtained. (Ex. 3, Hill Dep. at 259:19 – 261:7).

**Plaintiffs' Abandonment of the Transaction**

35. On June 14, 2006, Michelle Nolan of the City Department of Planning and Development wrote to Stephanie Hill to outline various additional steps that Plaintiffs would have to take in order to acquire the lots at issue from the City. (Ex. 3, Hill Dep. at 233:8-16; Ex. 15).

36. After June 14, 2006, Plaintiffs made no further efforts to pursue the transaction. (Ex. 3, Hill Dep. at 226:18 – 227:14, 233:8 – 236:2).

37. As of April 2008, the lots that Plaintiffs had sought to acquire were still available to be purchased from the City. (Ex. 9, Nolan Dep. at 175:19 – 176:8).

**Lost Profits Testimony**

38. Hill testified that Plaintiffs anticipated making a profit of $45,000 on each affordable living home sold, and $70,000 on each market value home sold. (Ex. 3, Hill Dep. at 265:6-14).

39. Hill's profit estimates were based on the assumption that construction costs for the affordable living and market value homes would be approximately $110,000 each and $125,000 each, respectively, and that affordable living homes would be sold for $155,000 each and market value homes for $195,000 each. (Ex. 3, Hill Dep. at 265:6-14).

40. The construction cost information was provided to Hill primarily by John Jones, Blythe's "financial consultant." Jones had been out of the home construction business for over 20 years at the time of this project and based his cost estimate on a conversation with a business

7

associate who was involved in "panel" homes in "California, Las Vegas, Texas, the Gulf." Jones made no effort to ascertain actual construction costs in Chicago. (Ex. 3, Hill Dep. at 266:10 – 267:3; Ex. 12, Jones Dep. at 70:11 – 71:22; 1st Am. Cmplt. ¶155).

41. Hill also testified that information from the project's architect, Phil Kupritz, supported the cost estimate. Hill testified that she did not know what, if any, analysis Kupritz had done, and that she did not know whether or not any estimates provided by Kupritz were accurate. (Ex. 3, Hill Dep. at 267:4-12, 268:9-17).

42. Hill's assumption that she would be able to sell affordable housing homes for $155,000 was based on information that was provided to her by Tracy Williams and Alderman Coleman, parties that Plaintiffs have accused of fraudulent conduct. Hill testified that Plaintiffs took no independent steps to verify what homes were selling for in the 16th Ward during the relevant time period. (Ex. 3, Hill Dep. at 267:24 - 268:6, 269:2-5).

43. Hill testified that she was not aware of any real estate developers who made a profit building housing in low income areas on Chicago during the second half of 2006, 2007, or 2008. (Ex. 3, Hill Dep. at 271:21 – 272:8).

**Plaintiffs' Disclosed Expert Opinions**

44. Plaintiffs have not disclosed any expert opinion regarding lost profits.

45. Plaintiffs have not disclosed any expert opinion regarding the supervision of an attorney.

46. The only expert report disclosed by Plaintiffs is that of Prof. Leonard Gross. (Ex. 16).

47. In his report, Prof. Gross does not offer any opinions regarding the Brown Udell Defendants' supervision of John DeAngelis. (Ex. 16).

48. At his deposition, Prof. Gross testified that he did not intend to offer any opinion at trial regarding the Brown Udell Defendants' supervision of John DeAngelis. (Ex. 11, Gross Dep. at 165:1 – 166:8).

Respectfully submitted,

MICHAEL I. BROWN, GLENN L. UDELL, MICHAEL S. POMERANTZ, and BROWN UDELL AND POMERANTZ, LTD.

By: /s/Kyle D. Rettberg
One of Their Attorneys

Terry D. Weissman
Kyle D. Rettberg
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 1700
Chicago, IL 60602-3801
(312) 269-8000

## CERTIFICATE OF SERVICE

The undersigned, Kyle D. Rettberg, an attorney, hereby certifies that on Tuesday, September 27, 2011, he caused a true and accurate copy of the foregoing The Brown Udell Defendants' Local Rule 56.1 Statement of Undisputed Material Facts to be served upon all counsel of record by electronic filing.

/s/ Kyle D. Rettberg
Kyle D. Rettberg

NGEDOCS: 1842131.1