IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BLYTHE HOLDINGS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 06 cv 5262 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| FLAWLESS FINANCIAL CORPORATION, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Blythe Holdings, Inc., and Chicago 100, Inc., filed an amended complaint against Defendants, including attorney John DeAngelis and his former law firm, Brown, Udell and Pomerantz, Ltd.[1] Plaintiffs bring RICO claims against other defendants, alleging that Plaintiffs were victims of a "real estate based scheme to defraud investors" in connection with the redevelopment of vacant lots in Chicago's 16th Ward. Plaintiffs bring related state law claims for legal malpractice and unjust enrichment against DeAngelis and the Brown Udell Defendants. Before the Court are the Brown Udell Defendants' motion for summary judgment [294] and DeAngelis's motion [297] for summary judgment. Also before the Court is Plaintiffs' motion [318] to strike the Brown Udell Defendants' objections to Plaintiffs' response to the Brown Udell Defendants' Local Rule 56.1 statement. For the reasons explained below, all three motions are granted.

---

[1] The amended complaint also names the law firm's principal owners, Michael Brown, Glenn Udell, and Michael Pomerantz. Together with the firm, the Court will refer to these Defendants as the "Brown Udell Defendants."

I.  **Background**[2]

In October 2005, Stephanie Hill was approached by Tracy Williams regarding the possibility of acquiring and developing 400 vacant lots in Chicago's 16th Ward; Alderman Shirley Coleman was to be involved in the transaction. [304 at ¶ 10, 306 at ¶ 7.] Hill formed Blythe Holdings, Inc., to pursue this acquisition; she is the sole director and officer of Blythe. [304 at ¶ 12, 306 at ¶ 3.] On October 26, Blythe entered into a consulting contract with Flawless Financial, one of Williams's businesses, which provided, among other things that "[Blythe] agrees to pay legal fees for a total of $50,000 to the attorney recommended by Flawless Financial and deliver a retainer fee to begin the process." [304 at ¶ 14, 306 at ¶ 4.] Plaintiffs did not engage John DeAngelis, then an attorney at Brown, Udell and Pomerantz, Ltd., until after retaining Flawless.[3] [306 at ¶ 13.]

On November 29, Hill counter-executed a retainer agreement in connection with the lot acquisition; the agreement had been signed by DeAngelis and was on his law firm's letterhead. [304 at ¶ 16, 306 at ¶ 14.] DeAngelis did not specifically inform the Brown Udell Defendants of his agreement to represent Blythe. [295-2 at Ex. 5 ¶¶ 6-7.] On December 1, Blythe paid a retainer fee of $25,000 with a check made payable to "John DeAngelis Esq." [304 at ¶ 17, 306 at ¶ 17.] DeAngelis deposited the check in the "John A. DeAngelis Client Fund Account" at the Northern Trust Company. [304 at ¶ 18, 306 at ¶ 18.] The Brown Udell Defendants had no

---

[2] The Court takes all relevant facts primarily from the parties' Local Rule 56.1 statements. [See 296, 299, 304, 306, 314, and 315.] In addition, the Brown Udell Defendants have filed a separate document containing "objections" to Plaintiffs' responses to the Brown Udell Defendants' 56.1 statement. [316.] These objections are the subject of Plaintiffs' motion to strike. [318.] Plaintiffs are correct that Local Rule 56.1 does not authorize such objections, which are essentially sur-replies. See *Moede v. Pochter*, 701 F. Supp. 2d 997, 999 (N.D. Ill. 2009). Accordingly, the objections will be disregarded. However, to the extent that Plaintiffs' responses do not comply with Local Rule 56.1, the Court will also disregard them. See *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[Local Rule 56.1(b)(3)(C)] provides the *only* acceptable means of * * * presenting additional facts.") (internal quotation omitted).

[3] DeAngelis had represented Williams in prior real estate transactions. [314 at ¶ 6.]

control over that account. [295-2 at Ex. 5 ¶¶ 15-17.] DeAngelis never shared any portion of the $25,000 retainer with the Brown Udell Defendants, nor did DeAngelis specifically inform the Brown Udell Defendants of the retainer. [295-2 at Ex. 5 ¶¶ 18-23.] The only attorney whom Plaintiffs had contact with at the law firm was DeAngelis. [304 at ¶ 20.]

On December 15, DeAngelis received a letter from Hill, stating that Blythe would be transferring $270,000 to his Northern Trust account and instructing him to disburse "$250,000 to Flawless Financial as final payment for the 100 residential lots provided by the City of Chicago and deeded to Blythe Holdings, Inc." [295-2 at Ex. 8.] On December 20, two investors in Blythe transferred $250,000 to DeAngelis's account at Northern Trust. [304 at ¶ 21, 306 at ¶ 22.] DeAngelis did not specifically inform the Brown Udell Defendants of this transfer. [295-2 at Ex. 5 ¶¶ 39-40.] The next day, DeAngelis caused $249,978 of the funds in his Northern Trust account to be wired to an account at LaSalle Bank held in the names of Flawless Financial and Tracy Williams. [304 at ¶ 23, 306 at ¶ 23.] None of these funds were ever used to purchase lots from the City of Chicago on behalf of Blythe. [314 at ¶ 11, 315 at ¶ 14.]

On January 10, 2006, DeAngelis sent a letter to Hill, advising her that Blythe had "paid the requisite fees in connection with the first 100 parcels, and we have begun the formal application process." [304-6 at Ex. G, 314 at ¶ 13.] DeAngelis also listed the steps in the City's approval process, beginning with submitting a formal application to the Department of Planning and Development. [304-6 at Ex. G.] DeAngelis wrote that, "[i]n terms of timing, the City can be difficult to predict," but that "60 to 90 days is possible." [304-6 at Ex. G.]

In mid-March 2006, Chicago 100, Inc., was formed with Hill's consent. [304 at ¶ 25.] On May 12, DeAngelis submitted an Application for Purchase of Redevelopment Project Area Property to Michelle Nolan at the Department of Planning and Development on behalf of

3

Chicago 100. [304 at ¶ 27, 306 at ¶ 32.] The application contained mistakes, but they were correctable and non-fatal to the acquisition of the lots. [304 at ¶¶ 28-29, 306 at ¶ 39.] Shortly after the application was submitted, one of Plaintiffs' investors, Stephen Forte, gave Plaintiffs an additional $250,000 to pursue the acquisition. [304 at ¶ 30.] However, this entire amount was spent by June. [304 at ¶ 31.]

On May 22, Hill requested that DeAngelis deliver a letter to Coleman on Hill's behalf. [306 at ¶ 33.] In the letter, Hill expressed her dissatisfaction with Williams and Flawless but also indicated her belief that the project could move forward. [299-16, 306 at ¶ 33.] On June 12, DeAngelis sent Hill's letter to Coleman. [306 at ¶ 34.] On June 14, Nolan wrote to Hill to outline various additional steps that Plaintiffs needed to take to acquire the lots. [304 at ¶ 35, 306 at ¶ 35.] Plaintiffs made no further efforts to pursue the acquisition. [304 at ¶ 36, 306 at ¶ 36.] Hill testified that she had no way of knowing whether the City would have approved the application, had it proceeded. [306 at ¶ 46.] As of April 2008, the lots that Plaintiffs had sought to acquire were still available to be purchased from the City. [304 at ¶ 37, 306 at ¶ 40.]

As previously stated, Plaintiffs filed an amended complaint, bringing RICO claims against other defendants and bringing related state law claims for legal malpractice, unjust enrichment, and equitable accounting against DeAngelis and the Brown Udell Defendants. The Court dismissed the legal malpractice and equitable accounting claims without prejudice. [221.] Thereafter, Plaintiffs moved to replead the legal malpractice claims. [226.] The Court granted Plaintiffs' motion. [238.]

During discovery, the only expert report disclosed by Plaintiffs was that of Professor Leonard Gross. [304 at ¶ 46.] Professor Gross opined that DeAngelis breached the standard of care required of attorneys by, among other things, failing to safeguard Blythe's property, namely,

the $250,000 transfer. [304-6 at Ex. E.] Professor Gross also opined that DeAngelis breached his fiduciary duty to Blythe by seeking to protect the interests of Williams and Flawless while representing Blythe, and by representing another entity, Hobbs, and Blythe regarding the same 16th Ward properties.[4] [306 at ¶ 53.] Professor Gross testified that, in his report, he did not opine that the Brown Udell Defendants had (or breached) any duty to ensure that DeAngelis complied with firm policies and procedures.[5] [295-3 at Ex. 11 p. 58.] Professor Gross also confirmed that his report set forth every opinion that he intended to offer at trial. [295-3 at Ex. 11 p. 58.] Professor Gross did not offer opinions on causation. [304-6 at Ex. E, 306 at ¶¶ 57-58.]

The Brown Udell Defendants moved for summary judgment on both the legal malpractice and unjust enrichment claims. [294, 295.] DeAngelis moved for summary judgment on the legal malpractice claim. [297, 298.]

## II. Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

---

[4] DeAngelis represented an entity in which Hobbs was involved while at Brown, Udell and Pomerantz, Ltd. [314 at ¶ 5.] Chicago 100's application and one of Hobbs's applications contained some of the same lots. [314 at ¶ 5.]

[5] In his report, Gross did, however, opine that the law firm was liable for DeAngelis's negligence and breaches of fiduciary duties through agency principles. [304-6 at Ex. E.]

5

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In turn, summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. And the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S at 252.

## III. Analysis

### A. Legal Malpractice

DeAngelis moves for summary judgment on Count XI, and the Brown Udell Defendants move for summary judgment on Counts XI and XII. In Count XI, Plaintiffs allege that, but for legal malpractice on the part of DeAngelis and the Brown Udell Defendants—specifically, in failing to timely pursue the real estate acquisition and in improperly transferring $250,000 to Flawless—Plaintiffs would have acquired the first 100 lots from the City of Chicago. In Count XII, Plaintiffs similarly allege that, but for legal malpractice on the part of the Brown Udell Defendants—specifically, in failing to supervise DeAngelis—Plaintiffs would have

acquired the first 100 lots. Plaintiffs seek to recover lost profits on the failed real estate deal as well as the $250,000 that DeAngelis transferred to Flawless. [See 238.]

Under Illinois law, a claim for legal malpractice requires a plaintiff to prove: "(1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that 'but for' the attorney's negligence, the plaintiff would have prevailed in the underlying action; and (4) damages." *Owens v. McDermott, Will & Emery*, 736 N.E.2d 145, 155 (Ill. App. Ct. 2000) (internal quotation omitted); see also *Mihailovich v. Laatsch*, 359 F.3d 892, 904 (7th Cir. 2004). Here, all of the action is on the third element, causation. Accordingly, Plaintiffs must put forth sufficient evidence that "but for [DeAngelis's and the Brown Udell Defendants'] malpractice, [Plaintiffs] would have been successful in the undertaking the attorney[s] [were] retained to perform" — namely, the acquisition of the first 100 lots from the City. *Owens*, 736 N.E.2d at 155.[6]

Plaintiffs have failed to demonstrate that the jury could find in their favor on causation. Rather, it is undisputed that: (1) the application that DeAngelis submitted to Michelle Nolan at the Department of Planning and Development on behalf of Chicago 100 contained correctable and non-fatal mistakes; (2) after the application was submitted and after DeAngelis transferred $250,000 to Flawless, one of Plaintiffs' investors, Stephen Forte, gave Plaintiffs an additional $250,000 to pursue the acquisition; (3) Nolan outlined various additional steps that Plaintiffs needed to take to acquire the lots, but Plaintiffs made no further efforts to pursue the acquisition;

---

[6] Plaintiffs' response brief attempts to recast the improper transfer claim in different terms; specifically, Plaintiffs argue that they only need show that the attorney's actions were the "legal 'but for' cause of a pecuniary loss in the amount of $250,000." [303 at 7.] However, as set forth in the Court's previous opinion, under Illinois malpractice law, Plaintiffs must prove that they would have been successful in the undertaking the attorney was retained to perform—namely, the purchase of the first 100 lots—had the transfer to Flawless not taken place. [See 238 at 4.]

7

(4) Hill testified that she had no way of knowing whether the City would have approved the application, had it proceeded; (5) as of April 2008, the lots that Plaintiffs had sought to acquire were still available to be purchased from the City; and (6) Plaintiffs' only expert, Professor Gross, did not opine on causation. Based on these facts, Plaintiffs cannot show that any malpractice that may have been committed by the attorneys precluded Blythe from obtaining the lots.

All of Plaintiffs' arguments in opposition to summary judgment can be countered by one or more of the undisputed facts listed above. For example, Plaintiffs argue that "the timing of DeAngelis's submission of the application precluded Plaintiffs from acquiring the lots." [303 at 6.] Not so. As set forth above, the application contained correctable and non-fatal mistakes. Moreover, as of April 2008, the lots that Plaintiffs had sought to acquire were still available to be purchased from the City. Plaintiffs' contention that DeAngelis submitted the application to the wrong department is irrelevant, as Plaintiffs have not pointed to evidence that they would have successfully completed the acquisition of the lots through *any* City program.[7] The defendants have shown that the transaction remained legally viable well after any malpractice, which supports an award of summary judgment. See *Mitchell v. Schain, Fursel & Burney, Ltd.*, 773 N.E.2d 1192, 1194 (Ill. App. Ct. 2002) (collecting cases).

Plaintiffs also argue that the testimony of their only expert, Professor Gross, defeats summary judgment. The Court disagrees. While Professor Gross opined that DeAngelis that and the Brown Udell Defendants breached duties to Blythe, he did not opine on causation. In

---

[7] The testimony of Shirley Coleman does not create an issue of fact for trial. According to Plaintiffs, Coleman testified that "it appeared to [her] than Blythe had the ability and financial wherewithal to develop the project" and that she "was willing to do what needed to be done in order to assist Blythe to get its sought development done." [314 at ¶ 17, 315 at ¶ 19.] Such speculation, even from a Chicago alderman, is woefully inadequate to prove that Plaintiffs would have successfully completed the numerous steps required to acquire the lots.

8

addition, Professor Gross testified that, in his report, which set forth all of the opinions that he intended to offer at trial, he did not opine that the Brown Udell Defendants had (or breached) any duty to ensure that DeAngelis complied with firm policies and procedures. This testimony is confirmed by the report itself, which does not offer any analysis of the standard of care governing attorney supervision. For these reasons, Professor Gross's testimony is insufficient to create a material issue of fact on either count. Thus, summary judgment will be entered in favor of Defendants on Counts XI and XII.[8]

B.  **Unjust Enrichment**

The Brown Udell Defendants also move for summary judgment on Count VII, which alleges unjust enrichment. Under Illinois law, a claim for unjust enrichment requires a plaintiff to prove "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989).

The Brown Udell Defendants argue that Plaintiffs have no evidence that the firm retained any "benefit" to Plaintiff's detriment. The Court agrees. Previously, the Court concluded that Plaintiffs had *alleged* an unjust enrichment claim by asserting that they gave a $25,000 retainer to DeAngelis and that DeAngelis was employed by the Brown Udell Defendants at the time. [See 222 at 23.] Such facts therefore plausibly alleged that the Brown Udell Defendants retained a $25,000 benefit to Plaintiffs' detriment. However, it is now undisputed that: (1) Blythe paid the $25,000 fee with a check made payable to "John DeAngelis Esq."; (2) DeAngelis deposited

---

[8] In support of its motion for summary judgment, the Brown Udell Defendants also argue that: (1) Plaintiffs were required as a matter of Illinois law to introduce expert testimony to support Count XII; and (2) Plaintiffs cannot recover lost profits under the Illinois "new business" rule. [295 at 10-14.] DeAngelis adopted the latter argument in his motion. [See 298 at 15.] Because the Court finds that Plaintiffs have failed to put forth sufficient evidence of causation, it need not reach these issues.

9

the check in a bank account over which the Brown Udell Defendants had no control; and (3) DeAngelis never shared any portion of the $25,000 retainer with the Brown Udell Defendants.[9]

Plaintiffs contend that the firm was DeAngelis's principal when he accepted the $25,000, and that the parties had an arrangement whereby the firm would get 50% of the fees that DeAngelis collected for them. But, even assuming this is true, Plaintiffs have not shown how these facts are material where the Brown Udell Defendants have demonstrated that they never *actually* received any portion of the $25,000 paid to DeAngelis. Simply put, the Brown Udell Defendants could not have unlawfully retained something that they never received. Thus, summary judgment will be entered in favor of the Brown Udell Defendants on Count VII.

## IV. Conclusion

For the foregoing reasons, Defendants' motions [294, 297] for summary judgment are granted. Plaintiffs' motion [318] to strike also is granted. Judgment is entered in favor of the Brown Udell Defendants on Counts VII, XI, and XII, and the Brown Udell Defendants are dismissed from this case. In addition, judgment is entered in favor of DeAngelis on Count XI.

Dated: July 23, 2012

Robert M. Dow, Jr.
United States District Judge

---

[9] Because this evidence was (properly) not before the Court when ruling on the various motions to dismiss, Plaintiffs' assertion that the Brown Udell Defendants are "rehash[ing]" an argument they made at that stage is unfounded. [See 303 at 15.]

10